DeQueen & Eastern Railroad Company *v.* Dye.

4-2897

Opinion delivered April 10, 1933.

*Abe Collins, Lake, Lake & Carlton* and *John S. Kirkpatrick,* for appellant.

*S. P. Jones, Franklin Jones, B. E. Isbell* and *Percy Woodard,* for appellee.

Butler, J. The appellee is an experienced brakeman and was in the employ of the appellant railroad

company on the 30th day of April, 1931, when he was injured while engaged in setting a brake on one of appellant's railway cars. He brought suit to recover damages for the injury, and for his cause of action alleged a violation of the National Safety Appliance Law in that the appellant failed to equip the car with efficient hand brakes, and that the defective condition of the brake furnished caused him to fall and sustain the injury.

The trial of the case resulted in a verdict and judgment in favor of the appellee, from which the appellant has prosecuted this appeal.

From the testimony of witnesses on behalf of the appellee, the braking equipment may be described as follows: "The brake wheel is on the top of the staff, and the staff runs down to below the sill or bottom of the car. The connection between the staff and the mechanism underneath the car that sets the brake is a chain anchored to the brake rod. The brake rod is connected by a system of levers to the brake shoes that press against the wheels to set the brake. The chain is fastened to the brake rod. The chain extends from the brake rod to the staff and is connected there usually with a bolt through the staff with a nut on it. With the brake released the normal position between the brake staff and brake rod with the proper brakes hooked up in proper shape would be slightly loose."

The manner in which the accident occurred and the situation was detailed by the appellee as follows: "The brake was on the opposite end of the car from the end on which I got on the car, which was moving when I got to the top of the car. We had not got to the place where we were going to stop the car. I got on the running board, which is right in the center of the top of the car and is made of wood boards about two feet wide. I went north on the roof of the car on the running board as the car moved. The car was about 40 feet long. The hand brake on this car was a platform brake. There was a platform at the end of the car. The brake wheel is about a foot and one-half above the top of the car. The platform is about two feet below the roof of the

car and is about two inches thick by eight inches wide and two feet long. It extends out eight inches from the end of the car. It was a metal platform with a rim around it. The brake shaft comes up through the platform, and the brakeman stands on this platform to set the brake, facing, in this instance, the north end of the car. The brake staff is three to five inches from the end of the car all the way up. The brake wheel looks pretty much like an automobile steering wheel and is fastened on top of the staff. The movement of .the wheel moves the staff, and the staff turns the brake chain. The rule is that the brake wheel is to be turned to the right, and this sets the brake. There is a dog, ratchet wheel on the brake platform, that works on a pedal. You move that with the toe after you set the brake. This ratchet wheel is fastened to the brake staff. It requires about all the power a man has got to set the brake. The brake wheel is about 18 inches in diameter. The brake is set by using both hands and revolving the wheel. You first wind it to the right, far enough to take up the slack, until you feel a resistance, and then you begin to set the brake which requires you to put all the power you've got behind it.'' . Continuing, the appellee stated that they were handling the cars on this occasion in the usual manner, and he began the operation for setting the brake in the customary way when a car was moving, and ''I set up this brake to where it was tight; then reached around and got a new hold and come on it as hard as I could. I was still standing with my face south to the end of the car and toward the brake wheel I was handling, and my back was the way we were going. My hands were right opposite each other across the wheel, across the end of the car, in front of me, and I come around with it there with all my might for the purpose of swinging to the left with all my power. This would give the brake wheel a right-hand turn. When I did this, I don't know what happened; it come loose. The wheel come plumb loose. The chain gave way down there some way or other, the wheel turned loose to the right all of a sudden and turned me loose. My weight was thrown to the left,

and, when that resistance ceased, my body went through the air and hit the ground.'' In describing the weather conditions appellee said: ''It came some kind of a little spring mist there, it wasn't raining at the time.''

The applicable portion of the statute alleged to have been violated provides that ''it shall be unlawful for any common carrier subject to the provisions of this chapter to haul or permit to be hauled or used on its line any car subject to the provisions of this chapter not equipped with appliances herein provided for, to-wit: All cars must be equipped with secure sill steps and efficient hand brakes.''

The evidence upon which the appellee relied as a basis for his recovery and to show a violation of the Safety Appliance Act was given by several witnesses who had been brakemen and who were experienced in application of brakes, but who had no experience in the building of cars or in the selection and assembly of their equipment. Their testimony may be thus summarized: In the operation of a safe and efficient brake, there would be required from one-half of a turn of the brake wheel to one and one-half turns thereof to set the brake, and where it required $2\frac{1}{2}$ turns of the brake wheel to set it, the operation was inefficient and unsafe. There were five witnesses who testified for the appellee, two of whom stated that, where a brake was in normal working order and properly hooked, one-half round or one round of the wheel would set the brake, while three other witnesses stated that a brake in this condition would require from one to one and a half rounds to set it. All these witnesses stated that, if a brake chain is so long that it takes two and a half or more rounds of the brake wheel to set it, the brake would not be in good serviceable condition.

Immediately after the happening of the injury to the appellee, the conductor of the train and a witness for him, ascended to the top of the car from which the appellee had fallen and set the brake. To perform this operation it required not less than two and a half turns of the brake wheel. All of the testimony, both on behalf

of the appellee and the appellant, gave this as about the number of turns required to set this particular brake.

The car from which appellee was thrown was No. 92305 Pere Marquette, and was one of a series of five hundred cars which had been manufactured by the Pressed Steel Construction Company of Pittsburg, Pa., for, and delivered to, the Pere Marquette Railway Company. The deliveries of this series of cars were made during the months of August and September of 1930, the car in question having been finally inspected and received by the railroad company on September 22, 1931, so that on the date of the accident to appellee it had been in use about seven months. The evidence is undisputed that these cars were made identically like a model or sample car which had been constructed and equipped under the supervision of the mechanical engineer and officers of the railway company and designed to comply with the National Safety Appliance Act and the rules of the Interstate Commerce Commission. It was also undisputed that, as the cars were constructed the parts were carefully inspected, and before they were turned over to the railroad company they were carefully gone over and measured, and the brake equipment was examined for the purpose of meeting the requirements of the Safety Act and rules. The length of the brake chain on this particular car and on all the other cars was the same, being 39¾ inches in length. On the final tests all cars should require about two and a quarter turns of the brake wheel to set the brake. These cars were immediately put in service and routed over the different lines of railway throughout the United States.

Testimony was given by several witnesses on behalf of the appellant who were experienced in designing and building cars and in the designing of equipment placed upon them. All testified without contradiction that the brake equipment on the car involved conformed to the best manufacturing standards, and this was the standard type of brake designed and used by the American Railway Association; that at least seventy per cent. of the box cars in service using a hand brake of the

type of the one in question would require as many as two and a half revolutions of the wheel in order to set the brake; that the Federal agents charged with the duty of making inspections under the Safety Appliance Act and enforcing the rules of the Interstate Commerce Commission with reference thereto were continuously through the country checking car equipment, whether new or old, and there had never been any prosecution or complaint based on the taking as many as two and a half turns of the brake wheel to set the brakes.

It is undisputed also that the car from which appellee had fallen was examined within an hour after the accident, and it was found to be in good condition. No loose or defective connections or any worn or defective parts and no part of the hand brake equipment out of adjustment was found. A test was made at the time of the efficiency of the hand brake and the number of revolutions of the wheel required to set it up, and no defect was found and the brakes used were in good order. An examination of the car was made at the time of the trial, and the braking equipment was found to be in the same condition as when inspected within an hour after the accident and the brake chain was found to be 39¾ inches long, the same as when taken from the factory. There was no dispute in any of the testimony except as to the opinions of the witnesses regarding the number of turns required for setting an efficient brake. Some of the witnesses for the appellee gave no reason for the conclusion that a brake requiring two and a half turns to set would be inefficient, but some thought this number of turns would cause the brake chain, in winding around the brake staff, to wind on itself and slip, but there was also testimony which is not disputed that this would sometimes happen on brakes requiring not more than one or one and a half turns to set.

An experienced brakeman testified for the appellee to the effect that there are various types of brakes. Some might prefer one type and some another; that many times, while he was engaged in braking, a link of the chain would wrap and slip off on the brake staff, and it could

not be known when this would happen. Continuing, he said: ''When one is engaged in braking, he would not know when that would happen. When I got ready to set a brake, it is my idea to take a good hold. I would not know but what there might be a wrapping of the link below. You cannot tell; that has happened to me several times on all types of cars; to avoid that I concluded it should not take over a lap and one-half.''

We are not advised by any evidence in the case as to what the result would be when a brake wheel had been turned sufficiently to tighten the brake preparatory to setting it and then being suddenly released—whether this would cause a revolution of the wheel backward sufficient to entirely unwind the chain from the brake staff or not. One witness, a lady who was nearby when the accident occurred, and who appears to be disinterested, stated that the brakeman was on top of the car walking along and had not reached the brake at all when from some cause unknown to the witness he slipped or stumbled and fell from the car. This testimony, together with the fact that it appears that no part of the brake chain was wrapped around the staff and that it took the full amount of turns—namely, two and a half to set the brake, indicates that the brakeman was not in fact engaged in the operation of setting the brake when he fell from the car; but, as the jury has ignored this testimony, so must we and determine from the facts, without considering this, what, if any, would be the liability of the appellant.

The appellant contends, in the first place, that the number of turns of a brake wheel required to set a brake is an engineering or mechanical question for the engineers and officers of the companies which built and designed and own the car in question. Next, the appellant contends that the alleged cause of the accident was one of the usual and ordinary risks incident to the employment.

Lastly, appellant contends that no justifiable inference of negligence against the appellant can be reasonably drawn from the evidence.

On the second contention made, reliance is had on the evidence which, it is claimed, shows that on all types of brakes it is not an unusual thing for a brake chain to wrap upon the staff in such manner that it will slip from that part of the chain upon which it is superimposed and fall on the brake staff causing a wabbling or jerking motion of the braking apparatus; and, on the last contention, it is insisted that the opinion of the appellee to the effect that "the brake chain gave way down there" can be nothing more than a conclusion or conjecture on his part, for he did not, and could not, see any part of the brake mechanism below the platform, and there was no evidence from any witness that the chain had in fact wrapped itself and slipped upon the brake staff. Appellant argues that, as the brake platform was made of metal only eight inches in width and so narrow that the employee had but little better than one-half of his feet on it and it was a damp morning, it is as reasonable to conclude that the platform was wet and slippery, and that this condition, together with the force used in setting the brake, caused the appellee to slip and fall as to conclude that the accident was caused by the brake chain wrapping on itself and slipping. Appellant also argues that under the circumstances and proof it is as reasonable to conclude that the appellee was mistaken in his belief that he had brought the brake to full tension before applying his utmost strength, and that he might have applied more force than was reasonably necessary under the circumstances; that he should have anticipated an unusual movement of the brake wheel, and that his hands might have slipped, as he failed to testify to the degree of strength with which he grasped the brake wheel before making the final effort. It is the contention of the appellee that the evidence leaves the cause of the happening of the accident uncertain, and in that state that it might be said that more than one cause might have produced the injury, for one of which the employer was responsible and for the other it was not, and that, for the jury to determine what was the actual cause of the accident, it would be necessary for it to indulge in speculation.

We pretermit an examination of these contentions, for an examination of the first question raised leads us to the conclusion that the position of the appellant on that is well taken. It was alleged and admitted that at the time of the accident the appellant was engaged, and the appellee was working, in interstate commerce. Therefore, the proposition presented must be determined in accordance with the rules announced by the Federal courts. It has been held in a number of cases decided by the Supreme Court of the United States, reference to which is made in appellant's brief, that by the several acts of Congress it took possession of the field of employers' liability to employees in interstate commerce by railroad, and all State laws on that subject were superseded, and that the rights and obligations of employers and employees depend upon those acts and the applicable principles of common law as interpreted by the Federal courts. This principle is recognized by both the appellant and the appellee, and the latter, to refute the contention of the appellant on the first point raised, relies upon the decisions of the Federal courts which he contends make the efficiency of the brake, and whether or not it was in violation of the Safety Appliance Act, questions for the jury, where there is testimony that a brake requiring more than one and a half turns to set is not a proper and efficient brake, and where it is shown that it did require more—to-wit, as much as two and a half turns —to set the particular brake, is sufficient evidence to submit to the jury the question of its efficiency. The cases cited are as follows: *C. R. I. & P. Ry. Co.* v. *Brown,* 229 U. S. 317, 33 S. Ct. 840; *Minneapolis & St. L. Ry. Co.* v. *Gotschall,* 244 U. S. 66, 37 S. Ct. 598; *L. & N. Ry. Co.* v. *Layton,* 243 U. S. 618, 37 S. Ct. 456; and *San Antonio & A. P. Ry. Co.* v. *Wagner,* 241 U. S. 476, 36 S. Ct. 626.

An examination of those cases discloses that they all deal with cases where injuries resulted from the failure of automatic car couplers to properly function. Automatic car couplers required by the Safety Appliance Act have been defined to be such as would have sufficient lateral motion to permit trains to round curves, with adjustable knuckles which can be opened and closed and ad-

justed, so that at all times they may make contact and fasten automatically by impact, and the standard prescribed by the act for such equipment is that there must be "couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the cars." This standard was made to apply in all cases whether or not the cars brought together are of the same kind, make or type. *San Antonio & A. P. Ry. Co.* v. *Wagner, supra.*

In *C. R. I. & P. Ry. Co.* v. *Brown, supra,* the injury sued for happened to a brakeman while he was endeavoring to make coupling between cars. The facts were that, while he was attempting to make the coupling, he was walking by the side of the train, as was proper for him to do; that from this position he could perform the operation if the couplers were in good condition. He made several efforts which failed to open the coupler, making it necessary for him to reach between the cars in order to raise the coupler pin so that connection might be made, and that in so doing he was injured. The court held that under the standard fixed by the act the failure of the coupler to function was sufficient to justify the inference that the law had been violated, and that the injury was the proximate result thereof, and that on this evidence it was properly submitted to the jury.

So, in *Louisville & N. Ry. Co.* v. *Layton, supra,* the court held that it was a plain violation of the act where cars were not equipped with automatic couplers which would couple by impact, and when there was evidence to show that they did not couple this was sufficient to warrant the jury in the finding that the act had been violated.

In *Minn. & St. L. Ry. Co.* v. *Gotschall, supra,* the injury was occasioned by a brakeman being thrown from a moving train as the result of couplers coming open while the train was in motion, causing an automatic setting of the emergency brakes and a sudden jerk. It was there held that it was proper for the jury under an instruction of the court to infer negligence on the part of the company from the single fact that the coupler failed to perform its function.

These cases, we think, have no application to the case at bar, for the reason that the act fixes no standard by which efficient brakes may be measured, such as was done in that part of the act relating to automatic couplers. The only requirement of the Safety Appliance Act with relation to hand brakes is that they must be efficient, and there is nothing in the act or the decisions of the courts from which it may be legitimately inferred that railway companies are insurers of the safety of their brakemen while engaged in the operation of such brakes or that any given number of turns of the brake wheel is necessary.

The Federal Boiler Inspection Act of February 17, 1911, as later amended, was passed for the same purpose as was the Safety Appliance Act, namely, to promote the safety of employees. These two acts are to be read and applied with the Federal Employers' Liability Act under which a defendant is liable for any negligence chargeable to it which caused or contributed to cause the injury to the employee, who will not be held guilty of contributory negligence or to have assumed the risk of his employment if a violation of the acts contributed to the cause of the injury. Under the provisions of both the Boiler Inspection Act and the Safety Appliance Act an absolute duty is imposed without regard to the exercise of ordinary care to comply with their provisions. Companies engaged in interstate commerce are not permitted to substitute some other appliance for that named in the act, but are held to a literal compliance with its terms.

The question, then, is, has the appellant company in the case at bar complied with the requirement of the statute by furnishing an efficient brake? It is to be observed that the car and its brake equipment were manufactured according to a well-recognized and generally approved standard, and that at least seventy per cent. of the cars in operation are equipped with brakes requiring as much as two and a half turns to set. This particular car was one of a series of five hundred, identical in manufacture and equipment, received during the months of August and September, 1930, and immediately placed in service and routed to various destinations throughout the United

States. The agents of the Federal government clothed with the duty of inspecting cars for defective equipment have made no complaint of any car of this series, or of any other car having a braking equipment requiring two and a half turns to set. These cars and their equipment were manufactured with the Safety Appliance Act and the rules of the Interstate Commerce Commission in mind, and were built and equipped so as to comply with the same. It is also to be remembered that immediately after the accident in question an examination of the car disclosed no worn or broken parts, no loose connections or other imperfections, and there were no structural defects. The question therefore of the efficiency of the equipment is a mechanical one. Since there are a number of mechanical questions arising in the determination of the proper construction of cars and their braking equipment, and, as there are various types of brakes, each of which has its particular advocates—some preferring one and some another—and as inventions are frequently occurring and many devices provided to accomplish a like purpose, it is not proper for courts to lay down rules which will operate to restrict carriers in their choice of mechanical means by which their operations may be conducted. Nor should such matters be left to the varying opinions and verdicts of juries.

In the case of *Baltimore & O. Ry. Co.* v. *Groeger,* 266 U. S. 521, 45 S. Ct. 169, an accident resulted from an explosion of a locomotive boiler, and the court submitted two issues to the jury for its decision—whether the explosion was caused in whole or in part from an unsafe condition in the crown sheet of the boiler which defendant permitted, and whether defendant's failure to have a fusible plug in the crown sheet violated the Boiler Inspection Act. On appeal the court held that the first issue was properly submitted to the jury, but that the trial court erred in its submission of the second. In passing on this question, the court noticed the requirements of the Boiler Inspection Act to the effect that use of any locomotive engine propelled by steam power was forbidden "unless the boiler * * * and appurtenances

thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb." Continuing, the court said: "Fusible plugs are made of soft metal, which will melt at relatively low temperature. They may be, and sometimes are, inserted into and used as part of the crown sheet; and are so shaped and placed that the end of the plug inside the boiler extends slightly above the surface of the metal surrounding it. It is intended that, if the water on the crown sheet shall be too low, the fire will melt out the plug before greater damage or explosion results, and allow the steam to escape from the boiler into the firebox and so relieve the pressure and check or extinguish the fire." The court there quoted from Rule No. 14 of the Interstate Commerce Commission as follows: "If boilers are equipped with fusible plugs, they shall be removed and cleaned of scale at least once every month. Their removal must be noted on the report of inspection," and, continuing, the court further said: "This does not purport to require fusible plugs to be used. There was none in the crown sheet in question. * * * It is a well-established rule that the master is not bound to furnish the latest or best tools or appliances for the use of his servants. That rule is applicable here, and we hold that defendant was not liable for failure to furnish the best mechanical contrivances and inventions or to discard appliances upon discovery of later improvements, provided the boiler was in proper condition and safe to operate, as required by the statute. The jury was by the charge authorized to find that the act required defendant to have a fusible plug in the crown sheet of the boiler. There is nothing in the act or in any rule, regulation, or order authorized by it, which specifies the use of fusible plugs. This, however, does not relieve the defendant of the duty to have and keep its boilers safe for use as required by the act. *Great Northern Ry. Co. v. Donaldson,* 246 U. S. 128, 38 S. Ct. 230. The use of fusible plugs has been known for a long time. The record does not contain a complete showing of the extent of

their use; but it appears that the Erie Railroad uses them, and that for some years defendant used them; that defendant has now about 2,700 locomotives, and does not have fusible plugs in any of them; and it was shown that they are not used by the New York Central, the Chicago, Burlington & Quincy, the Illinois Central, or the Nickel Plate. * * * It appears that, among practical men experienced in such matters, there is a difference of opinion as to the usefulness of such plugs. If the question whether the standard of duty fixed by the act required defendant to have a fusible plug in the crown sheet of the boiler were one for the determination of a jury, we think there was evidence which would sustain a verdict in the affirmative or in the negative. But we think the question was not for the jury. *So. Pac. Co.* v. *Seley,* 152 U. S. 145, 150, 14 S. Ct. 530; *Tuttle* v. *Milwaukee Ry. Co.,* 122 U. S. 189, 194, 7 S. Ct. 1166; *Randall* v. *Baltimore & Ohio R. R. Co.,* 109 U. S. 478, 483, 3 S. Ct. 322; *Kilpatrick* v. *Choctaw, O. & G. R. Co.,* 121 Fed. 11; *Richards* v. *Rough,* 53 Mich. 212, 216, 18 N. W. 785. And see *So. Pac. Co.* v. *Berkshire,* 254 U. S. 415, 417, 41 S. Ct. 162."

In the case of *Fredericks* v. *Erie Rd. Co.,* decided by the C. C. of A., Second Circuit of the State of New York, and reported in 36 Fed. (2d) at page 716, suit was brought for an injury to an employee while endeavoring to operate an appliance called a "petcock." After having passed on several questions, the court said: "The plaintiff also claimed that the engine was defective because of the unsafe location of the drain cock, and the defendant requested the court to charge 'that the jury can not find the engine defective on account of the location of the cock.' Instead of complying with this request, the court left the question of safe location to the jury, with some general remarks to the effect that it should not consider purely mechanical arrangement, but should determine whether the appliance was safe to operate, and proper and safe for the service in which it was to be used. When, as in this case, the evidence was overwhelming that the drain cock was located in the only place that it could be put and work properly, and that such location was of necessity uniformly used on lifting injectors by rail-

roads in the territory where the plaintiff was hurt, it was error to permit the jury to call into play its own ideas as to a safe and proper location, and allow it to find the engine defective because the drain cock was not placed, perhaps, where the jury thought it should have been put.''

There were several ex-brakemen and conductors testifying for appellee, who differed among themselves as to the number of turns of a brake wheel when it is properly functioning, and from the opinion held by the mechanical engineers and those whose duty it was to make a study of the equipment and operations of brakes. According to the judgment of these persons, a brake requiring more than one and a half turns was inefficient and in bad order. On the other hand, several witnesses skilled in the construction of braking equipment and familiar with their operation, stated that it was their opinion that brakes requiring not more than one and a half turns were not as well adapted to perform the functions for which they were designed as those having from two to three turns and these witnesses gave various reasons for their opinions.

It will therefore be seen that there is a difference of opinion among practical men as to the particular type of brake most efficient which brings this case within the rule announced in the case of *Baltimore & O. Ry. Co.* v. *Groeger*, and in *Fredericks* v. *Erie Ry. Co., supra.* As a result of our views, it follows that the trial court erred in not directing a verdict for the defendant at its request. The judgment of the trial court will therefore be reversed, and, as the case appears to have been fully developed, it will here be dismissed. It is so ordered.