

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00250-CV

———————————————

LENNON II FAMILY LIMITED PARTNERSHIP, Appellant

V.

GREGORY GIDEO; SOUTHERN UNDERGROUND, LLC; AGL
CONSTRUCTORS-JOINT VENTURE; ARCHER WESTERN CONTRACTORS,
LLC; GRANITE CONSTRUCTION COMPANY; AND THE LANE
CONSTRUCTION CORPORATION, Appellees

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 15-09569-442

Before Gabriel, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. INTRODUCTION

This case involves a dispute about whether Appellees Gregory Gideo; Southern Underground, LLC; AGL Constructors-Joint Venture (AGL); Archer Western Contractors, LLC; Granite Construction Company; and The Lane Construction Corporation improperly and without authorization utilized land owned by Appellant Lennon II Family Limited Partnership (Lennon II) by removing approximately 170,000 cubic yards of select fill soil and then dumping approximately 68,000 cubic yards of steel-reinforced concrete and asphalt millings and rubble without permission from Lennon II's principal, Chelsey Everett Lennon (Mr. Lennon).

The case proceeded to trial. After Lennon II's case-in-chief, the trial court granted a directed verdict on Lennon II's fraud claims. The jury charge included questions on, inter alia, Lennon II's claims for trespass and conversion and on Gideo's counterclaim for breach of contract. The jury found that Gideo and AGL had not trespassed but that they had converted Lennon II's property. However, when asked to assess the fair market value of the converted property, the jury answered "$0.00." On Gideo's counterclaim, the jury found that there was an agreement but that Lennon II had not breached it. In accordance with the jury's verdict, the trial court rendered final judgment that Lennon II and Gideo take nothing on their respective claims and counterclaim.

Lennon II raises five issues on appeal, which we will resolve as follows:

2

- The trial court did not err by directing a verdict on Lennon II's fraud claims. The record contains no evidence of an affirmative misrepresentation or of facts that would create the duty necessary to support a claim of fraud by nondisclosure. Likewise, there is no evidence of reliance.

- The jury's assessment of "$0.00" damages on the conversion claim reflected the failure of Lennon II to present evidence of the fair market value of the converted property.

- The jury's zero finding on conversion damages renders Lennon II's challenge to AGL's status as a bona fide purchaser moot.

- The evidentiary mix does not support Lennon II's claim that the jury's negative finding on its trespass claim was against the great weight and preponderance of the evidence.

- Lennon II contends that the refusal of the trial court to submit proper jury charge instructions permitted the jury to find that Lennon II stood in breach of a legally unenforceable contract. But the jury found no breach of the contract; thus, the trial court's failure to instruct the jury as Lennon II wanted was harmless. Further, unenforceability of the contract does not mean that actions taken in reliance on it constitute a trespass.

Therefore, we affirm.

## II. BACKGROUND

### A. Gideo meets Mr. Lennon and they make their first deal.

Lennon II is a Texas limited partnership that was created in 1995. Lennon, LLC is Lennon II's general partner with a 1% ownership interest. At all relevant times, Mr. Lennon was Lennon, LLC's manager, as well as one of Lennon II's limited partners.[1] Since 1995, Lennon II has been the owner of approximately 38 acres (the Property) in Denton County. There is no dispute that Mr. Lennon had legal authority to act on behalf of Lennon II with regard to the Property.[2]

Gideo has been in the excavation and dirt business since the early 1980s, often doing business as Southern Underground, LLC, a company formed, owned, and operated exclusively by Gideo. At trial, Gideo explained that he often does work for trade or barter, such as in exchange for dirt. Thus, Gideo said that he accumulates dirt and holds it to be sold at a later date.

Gideo testified that he met Mr. Lennon in the fall of 2007. Gideo said that he would see Mr. Lennon walking the Property, so he decided to ask Mr. Lennon if his cows could graze there. Mr. Lennon and Gideo ultimately agreed to let Gideo's cows graze there, and Mr. Lennon let Gideo move his travel trailer onto the Property, and

---

[1]Mr. Lennon's now-deceased wife was also a limited partner in Lennon II at its formation with each originally owning a 49.5% interest. Eventually, the Lennons' children and grandchildren were gifted and/or assigned fractional interests in Lennon II as limited partners.

[2]The trial court instructed the jury "that Mr. Lennon had legal authority to act for Lennon II with respect to the Lennon II Property."

in exchange Gideo would look after the Property and clean up refuse that had been dumped on it (Cattle-Grazing Agreement). Gideo testified that Mr. Lennon and he "made a cattle grazing contract out there on the -- at the [Property] one day, made a couple of copies. We both signed it." The contract was handwritten, and Gideo testified that it was "definitely" Mr. Lennon's idea to have something in writing, but at trial Gideo could not find his copy of the contract.

Gideo testified that from 2008 through 2015, he and Mr. Lennon became such good friends that Gideo could show up at Mr. Lennon's house unannounced. They would often go out to eat at McDonald's or IHOP®, and Gideo said that Mr. Lennon came over to his house for Thanksgiving one year and that it was "probably the happiest time I ever saw him." Gideo testified that he "[n]ever, never" lied to Mr. Lennon.

Gideo estimated that over the course of their relationship, he and Mr. Lennon had walked the Property "a hundred times." During these walks, Gideo said that Mr. Lennon talked a lot about his desire to develop the Property. Gideo testified that Mr. Lennon loved seeing the adjacent land—which belonged to Mr. Lennon's sister-in-law—being developed into a subdivision and that he would frequently ask questions about aspects of development. According to Gideo, Mr. Lennon wanted to develop the Property in a similar fashion to the residential development on the adjacent land. Gideo averred that Mr. Lennon wanted a 7-Eleven® included in the development but he also wanted to leave some of the trees for a residential

5

development and that he even wanted to have the first street on the Property named "Lennon Lane." During one of these conversations in the summer of 2013, Gideo informed Mr. Lennon that it would cost approximately $1 million to grade and clear the Property for development. Mr. Lennon, as Gideo testified, did not want to spend his money to grade and clear the Property.

### B. Gideo and Mr. Lennon make their second deal, which allowed Gideo to execute a contract with J.D. Abrams to use the Property and borrow dirt from it.

Also around the summer of 2013, Gideo had become aware of a road project near the Property to be performed by J.D. Abrams, LP, which would require about 20,000 cubic yards of dirt. Gideo negotiated an agreement with J.D. Abrams to pay $2,000 per month to Lennon II[3] to use a corner of the Property as a "lay-down area" and to pay Gideo $25,000 to "put up all the fence," install a "storm sewer across the lot," run a water line "up to their office," and install "all new gates." Finally, J.D. Abrams would borrow 20,000 cubic yards of dirt that it would have to fill back in.

At trial, Gideo introduced a handwritten document dated July 3, 2013. The document contained two hand-drawn ovals with "Borrow?" written inside of each. Gideo testified that these represented the two areas on the Property where J.D. Abrams would be able to borrow dirt. Gideo also testified that the document

---

[3]J.D. Abrams actually paid Gideo the monthly $2,000. Gideo testified that he always paid the $2,000 to Mr. Lennon though an audit suggested that three or four payments had not been passed along.

was "all" Mr. Lennon's drawing and that such a drawing was what Mr. Lennon did for all of his agreements with Gideo:

> Q.  Back off from that a little bit.  And this is a -- this is a handwritten agreement.  Tell us whose idea it was to have a handwritten agreement.

> A.  It was [Mr. Lennon's].

> Q.  And there's a drawing.  There's a drawing of the land.  Whose idea was it to make this agreement in the form of a drawing?

> A.  *It's all [Mr. Lennon].  I mean, that's the way all three of them were, even -- even the cattle grazing.  I mean, this is what this guy does.*

> I mean, he wants to sit with you, talk it through.  He'll mark what he feels like, and he's in control.  He doesn't -- if you -- if he -- if you try to say something that he don't like, it's struck.  It doesn't happen.

> . . . .

> Q.  Okay.  So as you were doing this handwritten agreement in the form of this map, just give us an idea of how it would be.  He's got some writing on it; you've got some writing on it.  Tell us how that would happen.

> A.  He -- he would -- he would -- he'd get a piece of paper, and he would get one piece of paper.  And he'd get a pen, and he'd say, okay, draw it like the -- what the property -- he called it the property.  I called it the farm.

> He'd say, draw the, like, perimeter on it.  I'd say, well, I'm going to put the creek through here.  I'll draw the barbecue stand here and J.D. Abrams over here, and here's where we want to borrow.  And I made them two little areas.

> And then he would take the pencil, and he would write what he wanted, like Goldfield Road and 2181.  He would write whatever he wanted.  [Emphasis added.]

Following this July 3, 2013 document, Gideo signed a "property usage and release agreement" with J.D. Abrams (J.D. Abrams Contract), which among other things, allowed J.D. Abrams to set up a concrete batch plant on 7.5 acres of the Property. Although Gideo was listed as the owner of the Property,[4] Gideo testified that he did not hide anything from Mr. Lennon and that he was authorized by Mr. Lennon to enter into the J.D. Abrams Contract because of the July 3, 2013 handwritten document. Indeed, Gideo testified that Mr. Lennon "didn't want to deal with [J.D.] Abrams. He wanted to deal with me. We made our deal. And I told him, you know, now that I know where we can take the borrow, I'll go to [J.D.] Abrams." At trial, Lennon II did not challenge the terms of, or Gideo's authority to enter into, the J.D. Abrams Contract and made no claim against Gideo or his company based on that agreement.

## C. Gideo attempts to broker a deal with AGL.

By 2014, AGL had a contract with the Texas Department of Transportation (TxDOT) to begin a road construction project (I-35 Express Project), which was described at trial as a "design/build project."[5] In March 2014, Gideo approached

---

[4]The J.D. Abrams employee who negotiated and signed the agreement with Gideo testified at trial that he believed at that time that Gideo owned the Property.

[5]A design/build project is distinguished from a "rip-and-read project" in that a design/build project is one in which the contractor, as opposed to TxDOT, designs the project. A rip-and-read project is one in which TxDOT has already designed the project with "a set of plans and the specifications" and it simply takes price bids from contractors.

8

AGL to inquire about supplying dirt and leasing the Property for AGL to use for a concrete batch plant.[6]  A series of text messages between Gideo and Andy Svehla, AGL's assistant project manager on the I-35 Express Project, showed that AGL wanted a written agreement with Lennon II.  Yet without any written agreement from Lennon II, in August 2014, Gideo and AGL entered into an agreement whereby Gideo sold 50,000 cubic yards of his own "Select Borrow Fill Material"[7] at $4.00 per cubic yard ($200,000 total) (AGL Contract).  The AGL Contract recited, inter alia, that Gideo would be responsible for loading the select fill into AGL's trucks and obtaining any required permits.

Svehla, who was involved in negotiating the deal, testified extensively as to how the $4.00 per cubic yard price was negotiated and what the price included.  Svehla testified that the price included not just the select fill dirt, but also Gideo's services for excavating and loading the dirt.  This testimony went as follows:

Q.  And you evaluated how much it cost per cubic yard.

A. Right.  Not just material, but the labor and the trucking combined as well.

Q.  So to get to the total costs per cubic yard, you had to look at whether y'all had to go pick it up and excavate it, right?

A.  Correct.

---

[6]One of the e-mail exhibits at trial showed that Gideo had been inquiring about providing dirt for the I-35 Express Project since July 2013.

[7]Select fill is different from and more expensive than common fill dirt.

9

Q. You had to look at whether you had to haul it.

A. Correct.

Q. And that -- then the price of the dirt gave you the total cost per cubic yard.

A. Correct.

Q. Now, in this particular case, when AGL went to the Lennon property, did AGL ever excavate the dirt?

A. No.

Q. Did AGL load the dirt onto its trucks?

A. No.

Q. So if we look at the Lennon/Gideo property, we see that you picked up C1 material, dirt.

A. Yes.

Q. And you paid $4 a cubic yard.

A. Correct.

Q. It included the cost of loading.

A. Yes.

Q. And then you all had to pay the truckers to drive it to wherever you needed it. Fair?

A. Fair.

Q. Now, the total there is $8.69. But if we look at your material costs, Andy, you paid $4 a cubic yard for this dirt to Mr. Gideo, and if you had purchased it from the Denton landfill, you only paid $1.60.

A. Correct.

Q. Why did you pay more money for this dirt?

A. That's a good question.

Q. Well, this dirt includes the fact -- the load cost is included in the price that you pay Mr. Gideo, correct?

A. Right. Yes, correct. We didn't have to provide the equipment or the labor to load it.

Q. In your opinion, in evaluating what you all paid for dirt, did you pay a fair market value for the dirt you purchased from this property?

A. On the high end of the market value.

Gideo testified that the 50,000 cubic yards of select fill in the August 2014 AGL Contract was his own soil that he had moved onto the Property, so after the first 50,000 cubic yards of select fill was exhausted, he "asked [Mr. Lennon] if we could have some dirt from the [Property]."

In late September 2014, when AGL began considering purchasing additional fill from the Property, it did "not want to write a change order until [it got] something from the owner." At trial Svehla clarified AGL's September 2014 concerns:

Q. (BY *[LENNON II'S COUNSEL]*) Bates 10 -- Mr. Svehla, do you have some concerns about Mr. Gideo's authority from the owner in September -- on September 26th of 2014, authority to sell another 100,000 cubic yards of select fill?

A. What was the date?

Q. September of 2014, September 26th.

11

A. I wouldn't call them concerns, but I was doing my due diligence to make sure that Mr. Gideo and Mr. Lennon were both on the same page as far as the additional 100,000 cubic yards.

. . . .

Q. Mr. Svehla, why -- after receiving the first 50,000 cubic yards of dirt that was in this stockpile, why did AGL want to enter into a secondary agreement to buy more dirt?

A. Because we needed more dirt on the project.

Q. And did -- what was the purpose in -- was there a different purpose? Since the first purpose was a stockpile and the second purpose of the contract involved some excavation, were there different concerns with that?

A. Well, the first 50,000 belonged to Mr. Gideo, and then the next 100,000 that we entered into the agreement was coming directly from the [P]roperty.

During October 2014, AGL and Gideo communicated about the amount of select fill to be purchased and the status of Gideo's communications with the "landowner." At the end of October 2014, AGL provided Gideo a change order to discuss with the "owner, and try to get him to approve it." Also at the end of October 2014, AGL drafted an agreement between Gideo and the landowner (AGL's Proposed Agreement) that AGL viewed as protecting its interests.

**D. The November 3, 2014 meeting and commencement of the AGL project.**

Representatives of AGL did meet with Mr. Lennon. On November 3, 2014, there was a meeting on the Property with Mr. Lennon, Gideo, Svehla, and AGL's truck manager on the I-35 Express Project, Kody Swesey. Gideo testified that the

12

purpose of the meeting was so "AGL could meet [Mr.] Lennon and also get an idea of where we were going to excavate and what the next step of our work would be." According to Gideo, he met Mr. Lennon that morning, they drove around the Property[8] and met with AGL, and after the meeting everyone "had a game plan" about what was going to happen next:

> Q. All right. And you -- can you tell us briefly what happened at the meeting there with the AGL people and Mr. Lennon?
>
> A. [Mr. Lennon] met me that morning over by the barn or the camper. We drove around the property. We met the AGL group. We talked, drove around --
>
> Q. All right.
>
> A. -- discussed what the plans were.
>
> Q. Okay. And at the end of the meeting, did you have an understanding about whether AGL was satisfied with the meeting with Mr. Lennon?
>
> A. I do.
>
> Q. And what was your idea about that?
>
> A. We had -- me, [Mr. Lennon,] and AGL had a game plan of what our next step would be.

Swesey testified that at the meeting he told Mr. Lennon that "it's lucky that we need this particular material while you're developing, or it would cost you $8 to $10 a cubic yard to remove it." Swesey noted that Mr. Lennon was actively involved at the

---

[8]Svehla testified that he and Swesey sat in the back of Gideo's truck and that Gideo and Mr. Lennon sat in the front.

meeting, including mentioning that he wanted to keep some of the trees. So Swesey left the meeting believing that Mr. Lennon was aware of and comfortable with the project and that he had given Gideo authority to act on the project:

> Q. Okay. Do you recall Mr. Lennon being adamant about leaving the trees on the Swisher Road frontage?
>
> A. Yes.
>
> Q. Do you recall him being adamant about leaving the trees on the west side of the property?
>
> A. Not all the trees, but some trees.
>
> . . . .
>
> Q. And is there anything that happened during your drive-around that gave you the impression that Mr. Gideo did not have Mr. Lennon's authority to be out there directing traffic and doing this work?
>
> A. No.
>
> Q. In fact, it was your impression that Mr. Lennon knew what was going on and had given Mr. Gideo that authority; isn't that true?
>
> A. Yes.

Svehla did acknowledge that there was no specific discussion at the meeting about AGL's Proposed Agreement or the additional 100,000 cubic yards of select fill. At trial, Svehla did not testify to any statements he made to Mr. Lennon during the meeting, nor did Lennon II offer testimony that any statements were made.

The day after the November 3, 2014 meeting, AGL communicated internally by e-mail about what AGL and Gideo wanted in a change order. The e-mail stated

14

that Gideo was "currently working with an engineer to design the property for a future development, so he wants to know how much material we will actually be using." Svehla was told to "[l]ock it down as a purchase, not borrow, for 100K CY."

A few days later, Gideo reported to AGL that Mr. Lennon would not sign AGL's Proposed Agreement. Instead, Gideo stated that he and Mr. Lennon had drawn up another handwritten agreement. That handwritten agreement (Development Plan) was a central focus at the trial. Specifically, Gideo testified that he and Mr. Lennon met at Mr. Lennon's home where Mr. Lennon instructed Gideo to use different color ink pens to memorialize their agreement. Gideo testified that the Development Plan contained a date "11/12/14," which was the day that the work would start. The Development Plan stated that Gideo would remove or uproot "all interior" trees and mulch them, remove a minimum of six inches of top soil, cut a new grade that drained the Property to the west, and seed the Property with grass. The Development Plan also stated that "[a]t [c]ompletion Lenoun [sic] gets his property ready for development[;] Gideo gets trees/mulch borrow/soil and use of property." Gideo testified that "Gideo gets borrow/soil" meant that Mr. Lennon had given him permission to take the soil and sell it to AGL.[9] The Development Plan also contained the following:

---

[9]Gideo and Svehla each testified that "borrow material" means dirt.

15

PROJECT AGREEMENT DATE
11-11-2014
C.E. Lennon (Owner)
[Gideo's signature] (Contractor) Greg Gideo

Gideo testified that Mr. Lennon handwrote this portion of the Development Plan,

except the last line where Gideo had signed it, wrote contractor, and printed his name.

Finally, the Development Plan provided, "Estimated completion for Lennon is

12/2015."

Lennon II's trial representative agreed that the Development Plan contained

Mr. Lennon's handwriting and his signature. Gideo believed that the Development

Plan was an agreement to go forward clearing trees and mulch and selling soil to AGL

to offset his costs of preparing the Property for development. In addition to this

document, Gideo directly testified that Mr. Lennon had given him permission to sell

dirt to AGL. So on November 12, 2014, Gideo, as Southern Underground, signed a

"contract change order" with AGL for an additional 100,000 cubic yards of select fill

at $4.00 per cubic yard ($400,000).

At trial, Lennon II highlighted an e-mail from the lawyer who worked for AGL

who had drafted AGL's Proposed Agreement that Mr. Lennon would not sign, in

which the lawyer stated that Mr. Lennon's refusal to sign AGL's Proposed Agreement

"[m]akes me worried." The lawyer then articulated his two concerns: "The two big

(and really only) things I had on there protecting us is 1) the owner warrants that he

owns the property, and 2) that it is understood that we are not obligated to bring back

16

all the material. Regarding 2, its [sic] not to say that we won't bring it back, but we don't want to be liable for refilling his hole . . . ." Finally, the lawyer was critical of whoever was helping Mr. Lennon: "On a separate note, if the property owner's lawyer drafted up what you attached, I feel sorry for the property owner . . . ."

Subsequently on the same e-mail chain, Svehla addressed these two concerns. He provided a Denton County Appraisal District link that apparently indicated Lennon II's ownership of the Property, and he stated that he had confirmed that AGL would not be responsible for bringing the select fill back to the Property.

### E. The additional dirt is excavated.

Gideo testified that as the AGL excavation and dirt removal was being completed, on multiple occasions Mr. Lennon came to the Property and even drove his car down through where the dirt was being removed and trucks were being loaded, and he never complained about what he saw occurring.

AGL's corporate representative testified that, in total, Gideo excavated and had removed 171,333.50 cubic yards of select fill from the Property for AGL's use, and AGL had paid Gideo $701,334. Mark Boyd, a civil engineer for Lennon II, calculated that approximately 178,000 cubic yards of soil had been excavated from the Property for AGL. Gideo acknowledged at trial that approximately 20,000 more cubic yards of select fill than had been contractually authorized was removed.

**F. AGL obtains Gideo's permission to place concrete and asphalt on the Property.**

Something else began happening in November 2014: AGL began placing steel-reinforced asphalt and concrete millings and rubble on the Property.[10] Svehla was directly involved in the decision to place asphalt on the Property. He sent Gideo a text message in December 2014 asking if AGL could dump 100 loads or 800 cubic yards of dirt and asphalt millings at the Property. A few weeks later Svehla sent Gideo another text message asking if AGL could place 30,000 square yards of concrete rubble on the Property. Gideo testified that he gave permission to AGL to place the asphalt and concrete millings and rubble.

In total, AGL placed some 68,000 cubic yards of steel-reinforced concrete and asphalt millings and rubble on the Property. However, Gideo testified that neither he nor AGL buried anything on the Property.

---

[10]Gideo also moved his cows from the Property. Although this formed the basis of Lennon II's pleaded breach-of-contract claim (on the theory that Gideo breached the Cattle-Grazing Agreement by removing his cows from the Property, thereby causing Lennon II to incur tax penalties from the Property's losing its agricultural tax exemption), Lennon II's trial representative disclaimed that it was pursuing a breach-of-contract claim on the Cattle-Grazing Agreement, the trial court directed a verdict that Lennon II take nothing on its breach-of-contract claim, and Lennon II does not raise an issue on its breach-of-contract claim on appeal.

Gideo also testified that he was unconcerned with the asphalt and concrete because it was "recyclable" and could be "cleaned up quickly."[11] Indeed, he testified that he had done similar work with AGL before and that when such a project is completed, it "look[s] like a park":

Q. Okay. Now, we looked -- in those pictures -- in several pictures yesterday with materials that were stacked on the property, and there were some big asphalt chunks. There were some concrete chunks. There was dirt and clay and the like.

But with respect to the -- the big asphalt chunks that were there on the property, did you know -- back at the time when this was happening, did you know those items were on the property?

A. Yes, I did.

Q. Okay. And were you worried in the slightest about those items being on the property at that stage of the project?

A. No.

_____

[11]Gideo testified as follows:

Q. . . . Um, Mr. Gideo, I've often heard the phrase, one man's trash is another man's treasure.

Is that -- is that analogy or that align -- is that applicable when we're talking about things like dirt, asphalt, rubble or concrete rubble, where one property owner might have some and not want it, and a contractor, another property owner might want it and need it?

A. It's very true.

Q. And so in this case, Mr. Gideo, the stuff that AGL brought as replacement material back to the Lennon property, you don't regard that as construction, quote, unquote, waste, do you?

A. No, it's recyclable.

19

Q. Why not?

A. It can be cleaned up quickly.

Q. Had you worked on similar projects with AGL before?

A. I have.

Q. And at the end of those projects that you worked on with AGL before, what does the property look like?

A. I'm not sure what you're asking me.

Q. Yes, sir. In those other projects that you've worked on with AGL, when it's -- whatever state the property is in when you're in mid-project, when it's all said and done, when you're allowed to complete the project and it's all said and done, what have those pieces of land looked like at the end?

A. They look like a park. They're beautiful.

## G. Mr. Lennon's son comes home.

In September 2015, Mr. Lennon's son, Glen, an arborist, returned from Australia, where he had lived since 1978. Glen indicated that the reason he returned was to help manage his father's affairs because his father had fallen and broken his hip in September of 2015.[12]

When Glen visited the Property, he was upset to find that the Property had all kinds of heavy equipment on it and looked "like chaos." According to Glen, the center of the Property had been "cored" and there were holes that had been dug and

---

[12]Glen also testified that Mr. Lennon had previously had cancer surgery on June 9, 2014, to remove his bladder.

20

left unfilled and mounds of dirt and debris. Glen also saw the J.D. Abrams concrete batch. When he was provided with the J.D. Abrams Contract, he saw that it was signed by Gideo as the owner. When Glen met with Gideo to find out the scope of his authorization and if Gideo had a "legitimate lease" regarding the Property, Gideo only produced "a drawing":

Q. Where did you meet with Mr. Gideo?

A. I and my wife met him at IHOP[®] on 35 right next to Swisher Road.

Q. And your wife's Wendy, correct?

A. Yes.

Q. All right. And what was the purpose of meeting with Mr. Gideo in September of 2015?

A. We wanted to know -- I wanted to know if Greg had a lease with my father, a legitimate lease that showed a term and time he could be on the land and determine limitations of what he could and couldn't do on the land.

Q. Okay. And -- and did he have a lease with your father?

A. He gave us a drawing.

Q. All right. And did the drawing provide for any kind of lease payments?

A. No.

Q. And did the drawing have any kind of term, like how long the lease would last?

A. No.

21

Q. And did the -- did the drawing contain any -- any benefits that Mr. Gideo would be able to remove from the land?

A. I think it showed Abrams was going to remove 20,000 cubic yards and replace it, and he was -- I can't recall.

. . . .

Q. In response to your meeting in September of 2015 with Mr. Gideo at IHOP[®], what did you do?

A. I said, is that all you have? He said yes.

**H. Lennon II files suit and enjoins Gideo from any further activity on the Property.**

Shortly after his meeting with Gideo, Glen filed suit for Lennon II against Appellees, alleging, inter alia, claims for conversion, trespass, fraud, and exploitation of the elderly. Glen testified that he was concerned about the welfare of the Property and that it was being taken advantage of and damaged. Lennon II obtained a temporary restraining order that stopped all of Gideo's activity on the Property. Gideo testified that he was stopped at 25% completion of the Development Plan but that he was willing to finish the project. Gideo eventually filed a counterclaim for breach of the Development Plan. The trial court granted summary judgment in favor of Gideo on Lennon II's exploitation of the elderly claim, and the parties proceeded to trial.

**I. The case proceeds to trial.**

The trial lasted from February 5, 2018, to February 20, 2018, with live testimony from fifteen witnesses and approximately 200 exhibits admitted into

22

evidence. At the time of trial, Mr. Lennon was 95 years old, and he did not testify in person or by deposition. The trial court sustained Appellees' objections to the admission of evidence concerning Mr. Lennon's out-of-court statements and any discussion concerning Mr. Lennon's health, and Lennon II does not appeal these evidentiary rulings.

### J. Lennon II's damage claims.

Among other things, Lennon II sought damages for the costs of having the Property restored to its prior condition, the loss of value to the Property, and for the value of the 170,000 cubic yards of select fill. Thus, Lennon II put on extensive testimony from a civil engineer, an environmental contractor, and a real estate appraiser.

Gideo testified that the select fill could have value to one person but no value to another. The director of Denton's Solid Waste Department testified that common fill soil sells for $375 per ton. The environmental contractor could not provide a specific price for select fill. And as quoted above, with regard to the $4.00 per cubic yard paid by AGL to Gideo, Svehla testified that the amount included Gideo's costs for excavating and loading the dirt for transport, which the AGL Contract confirmed.

### K. The jury returns a mixed verdict on the questions it was asked.

After the close of Lennon II's case-in-chief, the trial court directed a verdict for all Appellees on Lennon II's claims for breach of contract, negligence, fraud by nondisclosure, fraud by misrepresentation, and alter ego.

23

The trial court submitted fourteen questions to the jury as to Gideo and AGL only.[13] In response to Question 1, "Did any of the following trespass on Lennon II's property?" the jury answered "No" for both Gideo and AGL. However, in response to Question 7, "Did GIDEO convert property belonging to LENNON II?" and Question 8, "Did AGL convert property belonging to LENNON II?" the jury answered "Yes" to both. In response to Question 9, "Was AGL . . . a bona fide purchaser for value of the Property?" the jury answered "Yes." In response to Question 10, "What was the fair market value of the property converted at the time of the Conversion?" the jury answered "$0.00." The jury also found that Gideo and Lennon II had agreed that Gideo would clear, level, and alter the grade of the Property to make it ready for development in exchange for Gideo's use of the land and that Lennon II had performed under that agreement. In accord with the jury's verdict, the trial court rendered a take-nothing final judgment on all claims and counterclaims.

As noted, Lennon II raises five issues on appeal contending (1) that the jury's finding of $0.00 for the fair market value of the converted property was against the great weight and preponderance of the evidence, (2) that it was error to submit a question on whether AGL was a bona fide purchaser for value because it is not a

_____

[13]Although Lennon II's proposed charge defined "Gideo" to include both Gideo and Southern Underground and "AGL" to include AGL, Archer, Granite, and Lane, the charge given did not. Lennon II does not complain about the omissions of the other parties from the charge on its remaining claims.

24

defense to conversion as a matter of law, (3) that the jury's finding of no trespass was against the great weight and preponderance of the evidence, (4) that the trial court erred by submitting a question on whether there was an agreement between Gideo and Mr. Lennon without submitting a question on the agreement's primary purpose, and (5) that the trial court erred by directing a verdict that Lennon II take nothing on its fraud claims.

### III.  DIRECTED VERDICT ON LENNON II'S FRAUD CLAIMS

We begin with Lennon II's fifth issue because the resolution of it may impact the remaining four issues.  Lennon II contends that the trial court erred in directing a verdict on its fraudulent misrepresentation claim and fraud by nondisclosure claim. We note at the outset that our review is hampered by the fact that Lennon II's initial brief gave few specific examples of misrepresentations supported by record citations. Lennon II did attempt to narrow its focus in the reply briefs, but even then, Lennon II failed to support many of its assertions with record citations.  And in neither its initial brief nor its reply briefs does Lennon II cite authority for a legal duty of disclosure from any of Appellees.[14]

The record also presented a hurdle to Lennon II's fraud claims.  Mr. Lennon did not testify or participate in trial.  Lennon II's corporate representative Michael

---

[14]Lennon II's briefing also fails to clearly identify the evidence ostensibly supporting each element of the fraud claims despite that when appealing a directed verdict, "the appellant carries the burden of establishing that he presented some evidence *on each element of his cause of action.*"  *Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App.—San Antonio 1997, pet. denied) (emphasis added).

25

Carter testified that he was unaware of any dealings or communications between Gideo and Mr. Lennon from 2008 through 2015. Gideo and AGL representatives testified, all of whom affirmed that Mr. Lennon appeared to be in agreement with the development. Therefore, we note at the outset the difficulty that Mr. Lennon's absence posed to Lennon II's ability to prove its fraud claims: it had to present evidence supporting either a misrepresentation or partial representation requiring the disclosure of additional information without the benefit of testimony from the person to whom the alleged false statements were directed. That is, without Mr. Lennon there to dispute Gideo's and AGL's account of the events that transpired, no probative evidence was ultimately adduced to warrant submission of Lennon II's fraud claims to the jury.

Also problematic for Lennon II was the Development Plan, which in very broad terms provided Gideo the "trees/mulch," "borrow/soil," and "use of property." The Development Plan then called for a completion date of "12/2015." Although Lennon II complains about the condition of the Property when Glen came home, that was four months before Gideo's completion date. Thus, while Lennon II's real estate appraiser testified that none of the excavation that had been done increased the Property's value, we consider that in light of the fact that the project was still four months away from the agreed-upon completion date and Gideo's testimony that he was only 25% done, that when he had finished similar projects they looked "like parks," that the concrete and asphalt that had been placed

26

on the Property were recyclable and easy to move, and that the Development Plan provided Gideo wide latitude with respect to his "use" of the Property. Indeed, the evidence shows that just as Gideo testified, Mr. Lennon turned the Property's development over to Gideo with the caveats that the development be completed by December 2015 and that Lennon II would not pay out of pocket for tree removal, grading, and seeding. And just as he had done with J.D. Abrams, Mr. Lennon authorized Gideo to deal with AGL.[15]

For the reasons we will articulate, we conclude that the trial court did not err by directing a verdict that Lennon II take nothing from any of Appellees on its fraud claims.

## A. Standard of review

In reviewing the grant of a directed verdict, an appellate court follows the standards for assessing the legal sufficiency of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 809–28 (Tex. 2005); *see also Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, 192 S.W.3d 120, 126 (Tex. App.—Houston [14th Dist.] 2006, no pet.). In

---

[15]Although Lennon II at times appears to argue that Gideo fraudulently induced Mr. Lennon to enter into the Development Plan, our conclusion would not change under that theory because "[f]raudulent inducement is a species of common-law fraud that shares the same basic elements," which includes a material misrepresentation. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). And in that context, the misrepresentation is "a false promise of future performance made with a present intent not to perform." *Id.* Again, without testimony from Mr. Lennon, the record is simply devoid of any such misrepresentation; we don't know what Gideo promised Mr. Lennon, if anything, that may have induced him to enter into the Development Plan.

determining whether the evidence is legally sufficient, we review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 822, 827; *see also Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011) (op. on reh'g). An appellate court must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827; *see also Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 696 (Tex. App.—Fort Worth 2006, pet. denied). An appellate court must determine whether there is any evidence of probative force to raise a fact issue on the question presented. *See, e.g., Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004); *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam); *Sibai v. Wal-Mart Stores, Inc.*, 986 S.W.2d 702, 705 (Tex. App.—Dallas 1999, no pet.); *Edlund v. Bounds*, 842 S.W.2d 719, 723 (Tex. App.—Dallas 1992, writ denied) (op. on reh'g).

A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to a judgment. *See Edlund*, 842 S.W.2d at 723–24. A trial court may order a directed verdict in favor of a defendant when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

## B. Applicable law

### 1. Fraudulent misrepresentation

A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or the defendant intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp.*, 348 S.W.3d at 217.

### 2. Fraud by nondisclosure

Fraud by nondisclosure is a subcategory of fraud, which occurs when a party has a duty to disclose certain information and fails to disclose it. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). But the mere failure to disclose information is not sufficient to establish a fraud claim. A predicate must be established that imposes an obligation to disclose. To establish fraud by nondisclosure, the plaintiff must show that (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose those facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, which resulted in injury. *Bombardier Aerospace Corp. v. SPEP Aircraft*

29

*Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019); *Walterscheid v. Walterscheid*, 557 S.W.3d 245, 261 (Tex. App.—Fort Worth 2018, no pet.) (citing *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied)).

Generally "there is no duty to disclose without evidence of a confidential or fiduciary relationship." *Bombardier Aerospace Corp.*, 572 S.W.3d at 220 (citing *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)). A confidential relationship is one in which the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest. *Id.*; *see also Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (per curiam). "A fiduciary duty arises as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." *Bombardier Aerospace Corp.*, 572 S.W.3d at 220 (internal quotation marks omitted). An informal relationship giving rise to a duty may also be formed from "a moral, social, domestic[,] or purely personal relationship of trust and confidence." *Meyer*, 167 S.W.3d at 331. But there may also be a duty to disclose when the defendant (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth. *See, e.g.*, *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners*, 237 S.W.3d 379, 385–87 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 477 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g).

## C. Analysis

Lennon II's fraud arguments complain only about unspecified conduct of Gideo and AGL, not any of the other Appellees. Thus, we will examine the fraud issue separately with respect to Gideo and AGL. The fraud question that Lennon II requested did not attempt to hold one defendant liable for the allegedly fraudulent acts of the other. In other words, the question only inquired about the separate acts of fraud by each defendant. Though Lennon II did submit proposed questions on conspiracy with respect to Gideo and AGL, the trial court refused to submit those questions. Further, the trial court had granted AGL's no-evidence motion for summary judgment on the conspiracy claims. Lennon II does not challenge these rulings on appeal.

### 1. AGL

### a. No evidence of a misrepresentation

The first element of a fraudulent misrepresentation claim requires a misrepresentation. Without the benefit of Mr. Lennon's testimony at trial, this element proved to be too high a hurdle for Lennon II to overcome. No testimony was elicited from Svehla about any representations he made to Mr. Lennon at the November 3, 2014 meeting regarding either the additional 100,000 cubic yards of select fill or placing steel-reinforced concrete and asphalt millings and rubble on the Property.

The only representation in the record that we found from AGL to Mr. Lennon was from Swesey in which he agreed that at the November 3, 2014 meeting, he had told Mr. Lennon that AGL was "sav[ing] Mr. Lennon a fortune" because, as Swesey told Mr. Lennon, "[I]t's lucky we need this particular material while you're developing, or it would cost you $8 to $10 a cubic yard to remove it." Swesey was then asked, "[W]hat you told him as far as it saving him a fortune, was that true?" He answered, "Yes." No one contradicted him. Therefore, there was no evidence of a misrepresentation by AGL to Mr. Lennon.

Accordingly, because less than a scintilla of evidence supported that AGL made a material misrepresentation to Lennon II, the trial court did not err by directing a verdict in favor of AGL on Lennon II's fraudulent misrepresentation claim. *See Guevara v. Lackner*, 447 S.W.3d 566, 575–77 (Tex. App.—Corpus Christi–Edinburg 2014, no pet.) (affirming summary judgment on fraud claim because no evidence supported that defendant had made an affirmative, material misrepresentation).

### b. No evidence of a duty to disclose

With respect to fraud by nondisclosure, the second element requires a duty to disclose, and there is no general duty of disclosure absent a fiduciary or confidential relationship or unless necessary to correct or complete a prior representation. Lennon II inventories a number of facts that AGL allegedly failed to disclose to Mr. Lennon but again never tells us what triggered a duty to disclose these facts. No fiduciary or confidential relationship between Lennon II and AGL was pleaded,

32

proved at trial, or asserted in Lennon II's appellate briefing. Nor does Lennon II specifically assert on appeal that AGL had a duty to disclose based on a prior representation.

In analyzing a fraud claim in which the appellant had failed to identify the elements being challenged, the Dallas Court of Appeals recently noted that "[b]riefs are meant to acquaint the Court with a case's subject matter," so they "should not require the Court 'to connect unrelated dots, hunt down relevant authority, or speculate as to what exactly it is a party is attempting to argue or what relief it is requesting.'" *Great Hans, LLC v. Liberty Bankers Life Ins.*, No. 05-17-01144-CV, 2019 WL 1219110, at \*6 n.6 (Tex. App.—Dallas Mar. 15, 2019, no pet.) (mem. op.) (quoting *Brazos Elec. Power Coop., Inc. v. Texas Comm'n on Envtl. Quality*, 538 S.W.3d 666, 700 (Tex. App.—El Paso 2017), *rev'd on other grounds*, 576 S.W.3d 374 (Tex. 2019)). We share this sentiment with respect to Lennon II's briefing on its fraud by nondisclosure claim. However, notwithstanding Lennon II's failure to identify the basis from which AGL had a duty to disclose, we analyze the relevant options and conclude none are supported by a scintilla of evidence.

Lennon II highlights AGL's representatives' silence during the November 3, 2014 meeting as demonstrating an actionable fraud by nondisclosure. But the parties' locations at the meeting—with both AGL representatives sitting in the back seat and Mr. Lennon and Gideo sitting in the front seat—actually underscores that AGL had no relationship with Lennon II that gives rise to a duty to disclose. In our review of

33

the entire trial record, we glean no facts that give rise to any fiduciary or confidential relationship between AGL and Lennon II that could establish a duty to disclose. Testimony that Mr. Lennon had his own lawyer review the AGL Proposed Agreement before he chose not to sign it also supports that this was an arm's length business transaction from which no duty of disclosure arose.

Lennon II contended that AGL acted tortiously by taking soil from the Property and dumping asphalt and concrete materials on it. A party may commit a tort but still not be liable for a misrepresentation. The trial court submitted two tort-based causes of action based on AGL's alleged wrongs: trespass and conversion. But the third tort-based claim—fraud—required more than AGL's allegedly doing something that it was unauthorized to do. Fraud requires either a misrepresentation or a failure to disclose when a duty to disclose has arisen. Here, the interactions between AGL and Mr. Lennon were extremely limited. There may have been facts that AGL knew that Mr. Lennon did not know.[16] But again, fraud requires proof

---

[16]Though a minor matter, Lennon II tells us in its opening brief that AGL's representatives denied that there was a discussion of the development of the Property between Mr. Lennon and Gideo during the November 3, 2014 meeting. Lennon II made a similar assertion to the trial court: "Mr. Gideo testified that they talked about the development of the [P]roperty [at the meeting]. Both AGL representatives denied that that occurred." Though not completely clear why this matter is highlighted, we assume that it is raised as evidence of a claim that Mr. Lennon was in the dark about the plans for the Property or that he did not show any desire to develop the Property.

But the record indicates that each of AGL's representatives heard Mr. Lennon discuss the development of the Property. Svehla testified as follows:

34

AGL misrepresented facts to Mr. Lennon or was obliged to disclose what it knew to him. In these regards, the record contains no evidence of a misrepresentation-based cause of action. *See Citizens Nat'l Bank*, 142 S.W.3d at 477.

---

Q. And Mr. Lennon was concerned about saving trees around the pond and on the front of the property where it faced Swisher Road, correct?

A. Yes, sir.

Swesey also testified that Mr. Lennon discussed various aspects of the development of the Property, including which trees would remain:

Q. Okay. Do you recall Mr. Lennon being adamant about leaving trees on the Swisher Road frontage?

A. Yes.

Q. Do you recall him being adamant about leaving the trees on the west side of the property?

A. Not all the trees, but some trees.

. . . .

Q. And is it fair to say that during that drive-around, Mr. Lennon was actively involved in what was going on?

A. Yes.

Q. And so he was the one that was pointing out, you know, these trees have to be saved, and these trees over here have to be saved, and this is the way I want the ground to be sloped when y'all are done with this work. Is that correct?

A. He didn't say anything about how he wanted the ground to be sloped. But, yes, he was directing us about the Greenscape areas and the trees.

35

Accordingly, the trial court did not err by directing a verdict on Lennon II's fraud by nondisclosure claim against AGL.

### 2. Gideo

#### a. No evidence of a misrepresentation

Even without Mr. Lennon's testimony, Gideo's contention on appeal that there was "*no evidence of any representation by Gideo to Lennon at all*" is incorrect. That is because Gideo *himself* testified to certain representations he made to Mr. Lennon. For example, Gideo testified that he told Mr. Lennon that the cost of clearing and grading the Property would be $1 million: "But I told him -- I said, you know what? I threw this at him. I said, for, you know, a $1,000,000, you can get the [Property] cleaned up or trees gone. You can get some grading planned, get a good idea what you're going to do." Gideo also testified that he told Mr. Lennon that he could grind and mulch trees from the Property and then sell them to help pay for the cost of developing the Property: "I said, you know, if I grind [the trees], I'm going to turn them into compost, and I'm going to -- I'm going to sell them. And then that's one way, you know, I can get the grading done and get -- get this ready for development."

Evidence of these representations notwithstanding, it is a *misrepresentation* that is required to support a fraud claim. And in that respect, Gideo is correct that Lennon II presented "no evidence of any misrepresentation by Gideo to Lennon [II]." There was no evidence that Gideo's above-quoted statements were false. Moreover, no evidence was elicited that Gideo had told Mr. Lennon that

Lennon II would be paid for the removal and sale of the select fill. No evidence was elicited that Gideo had told Mr. Lennon that Gideo would not profit or retain the proceeds from the sale of the dirt. And no evidence was elicited that Gideo had told Mr. Lennon that no concrete or asphalt would be placed on the Property while Gideo was completing grading and development of the Property as provided in the Development Plan.

Further, direct evidence supported that Gideo had made no material misrepresentation to Mr. Lennon. Gideo himself testified that he had "[n]ever, never" lied to Mr. Lennon. Lennon II, through its corporate representative, Mr. Carter, conceded on cross examination that it had no knowledge of any false statements Gideo made to Mr. Lennon:

Q. And you claim that Gregory Gideo committed fraud, don't you?

A. Yes, I do.

Q. But the truth, sir, is that you don't know anything about the conversations between Everett Lennon and Gregory Gideo, do you?

A. No, I don't, but I do know my conversations with him.

. . . .

Q. (BY *[GIDEO'S COUNSEL]*) Sir, you don't know anything about Mr. Gideo's and Everett Lennon's relationship between 2008 and 2015, do you?

A. No, I don't.

Q. Yet not knowing anything about those conversations and not knowing anything about their relationship, you allege fraud, right?

37

A. That's correct.

. . . .

Q. (BY *[GIDEO'S COUNSEL]*) My question to you, sir, is you can't tell us a single thing that Greg Gideo allegedly said that was untrue or misleading, can you?

A. No.

And AGL's internal e-mail revealed that Gideo had informed Svehla in November 2014 that Gideo was "currently working with an engineer to design the property for a future development." This statement to a third party suggests that Gideo was indeed developing the Property as he had agreed.

Accordingly, because no evidence supported that Gideo made a material misrepresentation to Lennon II, the trial court did not err by directing a verdict in favor of Gideo on Lennon II's fraudulent misrepresentation claim. *See Guevara*, 447 S.W.3d at 575.

### b. No evidence of a duty to disclose

Lennon II's appellate briefing of its fraud by nondisclosure claim with respect to Gideo suffers the same problem as its briefing with respect to AGL: it does not specifically identify the basis of Gideo's duty to disclose, the second element of the claim. However, just as we did above, we analyze the relevant options that would create a duty of disclosure and find them wanting.

38

Although Gideo testified that he had a close relationship with Mr. Lennon—frequently eating out together and even having Mr. Lennon over for Thanksgiving dinner—"even a longstanding relationship of friendship or cordiality is insufficient, without more, to establish an informal fiduciary relationship." *Lee v. Hasson*, 286 S.W.3d 1, 15 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Gideo testified that Mr. Lennon wanted to memorialize their agreements in writing because "this is what this guy does." The circumstances of these documents, which according to Gideo were hand drawn at Mr. Lennon's instruction, do not demonstrate a relationship of trust and confidence that would give rise to a duty to disclose. *See Schlumberger Tech. Corp*, 959 S.W.2d at 177 (holding that "mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship"). Therefore, while Lennon II's appellate briefing contains no assertion of a fiduciary relationship between Gideo and Mr. Lennon that would give rise to a duty to disclose, in the interest of thoroughness, we briefly analyze and conclude that no such fiduciary relationship is supported on this record.

If Lennon II's theory is that Gideo had a duty arising out of a previous representation, the theory is unsupported by any probative evidence. The few representations Gideo made to Mr. Lennon—i.e., that it would cost $1 million to prepare the Property for development and that he could grind and sell the trees as a way to help pay for the development and grading—were not shown to be false, did not create a false impression, and did not otherwise create a duty to disclose any

additional information regarding the sale of the additional 100,000 cubic yards of select fill or the placing of concrete and asphalt millings and rubble.

Further, the Development Plan provided Gideo wide latitude, without any apparent restrictions, to "use" the Property and have the dirt and mulch. In exchange, he would complete the development by December 2015. Nothing in the Development Plan or any testimony at trial demonstrated that Gideo needed to check in or update Mr. Lennon on the day-to-day sausage-making involved in the development and excavation that was taking place. Instead, this arrangement seemed in accord with Mr. Lennon's desire to have the Property prepared for development by December 2015 and at no out-of-pocket cost to Lennon II.

Because there was no evidence to support that Gideo had a duty to disclose, the trial court did not err by directing a verdict in his favor on Lennon II's fraud by nondisclosure claim.

### 3. No reliance

As a further and alternative holding, we also conclude that a directed verdict was proper because Lennon II failed to put on more than a scintilla of evidence to support the justifiable reliance element of both fraud claims. *See Bombardier Aerospace Corp.*, 572 S.W.3d at 220 (reciting reliance on the nondisclosure as element of fraud by nondisclosure); *Exxon Corp.*, 348 S.W.3d at 217 (reciting that the plaintiff must actively and justifiably rely on the misrepresentation to support fraud claim).

40

A plaintiff establishes reliance by showing the defendant's acts and representations induced him to act, or refrain from acting, to his detriment. *Worldwide Asset Purchasing, L.L.C. v. Rent–A–Center E., Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.). Lennon II's argument is that Mr. Lennon would not have agreed to let Gideo develop the Property under the Development Plan if he had known that Gideo was going to make $700,000 on the sale of the select fill, that the Property was going to be excavated such that it created a pond, that Gideo was going to accept concrete and asphalt millings and rubble on the Property, and that Gideo was going to remove his cows and cause the Property to lose its agricultural tax exemption.

But,

- there was no testimony or evidence to show that Mr. Lennon expected Gideo to develop the Property for free. Indeed, Gideo testified that Mr. Lennon did not want to pay to develop the Property and that he wanted Gideo to make money on the dirt and mulch in exchange for the development.

- there was no testimony or evidence to show that Mr. Lennon expected the excavation and removal of soil would not cause significant, temporary holes on the Property, even to the point of creating a small pond. Indeed, Gideo testified that Mr. Lennon visited the Property on

41

multiple occasions and even drove down into holes without objecting to what he saw. And

- there was no testimony or evidence that Mr. Lennon expected Gideo to prevent AGL from temporarily placing materials on the Property, or that he expected this development to occur with Gideo's cows remaining on the Property. Indeed, Lennon II's trial representative testified that Lennon II was not pursuing a breach of contract claim against Gideo for breach of the Cattle-Grazing Agreement. And Gideo testified that he had no knowledge whatsoever that the Property had an agricultural tax exemption.

Without the benefit of such evidence, any assertion of Lennon II's reliance is based solely on speculation and "[s]peculation is not evidence." *Hurley v. Tarrant Cty.*, 232 S.W.3d 781, 787 (Tex. App.—Fort Worth 2007, no pet.). Thus, because no evidence of reliance was adduced at trial, it was proper for the trial court to direct a verdict that Lennon II take nothing on its fraud claims against all Appellees.

Accordingly, we overrule Lennon II's fifth issue.

### IV. $0.00 FAIR MARKET VALUE FINDING

Having overruled Lennon II's fifth issue, we turn now to its first.

Lennon II's argument in support of its first issue is that because the jury found that Gideo and AGL converted select fill from Lennon II, a finding of $0.00 for the

fair market value of the converted property must be reversed because it is against the great weight and preponderance of the evidence.

The essence of Lennon II's argument is that a finding of conversion requires an award of some amount as damages: "The trial court erred in rendering judgment on this verdict because the undisputed evidence is that the converted property had value, which supports a finding that Lennon [II] incurred some damages. . . . *Where the evidence establishes a conversion injury, the jury must award some amount of damages.*" [Emphasis added.] To support its proposition, Lennon II cites us a plethora of personal injury cases that stand for the principle that when a measure of damages is unliquidated, a jury cannot disregard objective evidence of injury and simply not assess any damages in the face of that evidence. But a different principle applies in this case. The jury was asked to determine the fair market value of the property that was converted and was given a definition of fair market value. The record below lacks evidence of what the fair market value was for select fill material removed from the Property and, thus, lacked the data necessary for the jury to answer the question presented to it. We cannot fault the jury for failing to make a computation of damages when it was not given the data necessary to make that computation.

### A. Standard of Review

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the

finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When the party *with* the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the credible evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

### B. A conversion finding does not require the jury to award some damages.

Lennon II's contention that "[w]here the evidence establishes a conversion injury, the jury must award some amount of damages" is an incorrect statement of law. Indeed, a party cannot leave the jury in the dark by failing to present evidence to establish the fair market value of converted property and then challenge the finding that reflects the jury's refusal to assess damages that required the data to assess.

For example, in *R.J. Suarez Enterprises Inc. v. PNYX L.P.*, the Dallas Court of Appeals was presented with an appeal from "the portion of the trial court's final judgment finding in its favor on its claim for conversion, but ordering that it take-nothing in its suit against [the defendants]." 380 S.W.3d 238, 240 (Tex. App.—Dallas 2012, no pet.). Suarez Enterprises owned a sandwich shop but had decided not to

44

renew its lease. *Id.* at 241. Suarez Enterprises and the landlord disagreed over the ownership of the following items: a walk-in cooler, walk-in freezer, sandwich unit, beverage cooler, and ice machine. *Id.* The new tenant then took control over most of the disputed items. *Id.* Suarez Enterprises filed suit alleging, inter alia, a claim of conversion of the disputed items. *Id.* at 242. After a bench trial, the court found in favor of Suarez Enterprises on its claim for conversion but ordered that it take nothing on its claim. *Id.* Interestingly, the trial court made a finding that at the time of the conversion the disputed property did have some market value but that Suarez Enterprises had not presented any evidence on the fair market value of the disputed property and had "merely presented value of replacement cost." *Id.* at 247. On appeal, Suarez Enterprises challenged, inter alia, the finding of zero damages. *Id.* at 242.

The Dallas Court of Appeals began with the proposition that "[e]ven when there is evidence supporting a *finding* of conversion, *there must be evidence of the fair market value of the converted property to support a damages award.*" *Id.* (emphasis added) (citing *Ayala v. Valderas*, No. 02-07-00134-CV, 2008 WL 4661846, at *5–6 (Tex. App.—Fort Worth Oct. 23, 2008, no pet.) (mem. op.)). But Suarez Enterprises had presented evidence of replacement costs only, and the Dallas Court of Appeals could not "agree with Suarez Enterprises['] contention that replacement value and fair market value are identical." *Id.* at 247. Thus, the Dallas Court of Appeals concluded that the trial court's finding that Suarez Enterprises take nothing on its claim for conversion—even

45

in light of its findings that a conversion occurred, that the converted property had "some market value," and that Suarez Enterprises presented evidence of replacement cost—was not against the great weight and preponderance of the evidence. *Id.* We read this case as standing for the proposition that a conversion finding does not require an award of damages if damages are not supported by the evidence. *See id.*; *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997) (per curiam) ("A plaintiff must prove damages before recovery is allowed for conversion.").

Indeed, the principle that we invoke is found not only in *Suarez Enterprises* but in authority from this court cited by *Suarez Enterprises*. *Ayala*, 2008 WL 4661846, at *6. *Ayala* dealt with the mirror image of Lennon II's appellate point; the claim in *Ayala* was that the jury finding quantifying damages was not supported by factually sufficient evidence. This court sustained the factual sufficiency challenge because the record did not contain evidence of the fair market value of the converted property:

> The jury's damages award is based on [the plaintiff's] "List of Claims," not Ayala's testimony regarding the value of the items that she sold. *Consequently, although the jury had broad discretion to award damages within the range of evidence presented at trial, a rational basis does not exist for its calculation because the award is not appropriately based on the fair market value of the property at the time of the conversion.* We hold that the evidence is factually insufficient to support the jury's damages award.

*Id.* (emphasis added). We read *Ayala* as requiring evidence directed to the fair market value of the converted property as a necessary prerequisite to an award of damages in a conversion claim.

The case that we relied on for our holding in *Ayala* reinforces this proposition. *See Bishop v. Geno Designs, Inc.*, 631 S.W.2d 581, 584 (Tex. App.—Tyler 1982, no writ). *Bishop* summarized the need for evidence of the market value of the converted property as follows:

> The measure of damages in a conversion case is the value of the property converted at the time of the conversion, with legal interest. *Imperial Sugar Co. v. Torrans*, 604 S.W.2d 73, 74 (Tex. 1980). It is essential that the market value of the property at the place and on the day of conversion be established to recover. *Engineered Plastics, Inc. v. Woolbright*, 533 S.W.2d 906, 908 (Tex. Civ. App.—Tyler 1976, no writ). Compensatory or actual damages are not measured in a conversion case by the price at which the goods in question were sold by the defendant but by market value at place and time of conversion. 15 Tex. Jur.3d Conversion [§] 44 (1981). The court in *Jackson v. Taylor*, 166 S.W. 413 (Tex. Civ. App.—Fort Worth 1914, no writ), held that evidence that an alleged converter sold the [converted] property at a certain price was inadmissible. *Id.* at 414.

*Id. Bishop* applied the need for evidence of fair market value in a fashion that has direct application to our holding in this appeal: "Although we believe there is some evidence in the record to support the jury finding that Bishop converted Geno's property, we do not believe that the proper measure of damages was proved." *Id.*

Lennon II has failed to support the application of the so-called zero-damages rule to the instant conversion case. Indeed, even when there is evidence supporting a finding of conversion, "there must be evidence of the fair market value of the converted property to support a damages award." *Suarez Enterprises*, 380 S.W.3d at 242. And even when there is evidence of some value but not the proper type of value, we are not required to remand rather than render judgment. *See id.* at 247;

47

*United Mobile Networks, L.P.*, 939 S.W.2d at 148 ("Because UMN did not offer any competent evidence to support its damages claim for conversion, we reverse the court of appeals' judgment in part and render judgment that UMN take nothing against the Deatons.").

## C. None of Lennon II's authorities are conversion cases.

We have carefully analyzed the cases Lennon II relies on. Those cases— including a page of string-cited cases—in support of the proposition that the jury could not return a $0.00 fair-market-value finding after it had found Gideo and AGL had converted Lennon II's property are inapplicable. Almost every case cited therein concerned a zero-damages award in the context of a personal injury case in which the plaintiff had suffered *objective and undisputed bodily injuries*.[17] The only case cited by

---

[17] *See Pool*, 715 S.W.2d at 630 (involving "products liability action arising out of an alleged defect that caused [the driver's] pick-up truck to go out of control" and caused the driver to sustain "serious head injuries when his truck ran off the road and collided with a tree"); *Lowery v. Berry*, 269 S.W.2d 795, 796–97 (Tex. 1954) (affirming court of appeals's decision to disregard a jury's award of zero damages because the answer was contrary to the evidence that showed a three-year-old girl had been injured when she was run over by an automobile and sustained "multiple fractures of the skull and the skin and tissues of the left side of her head were so severely torn that that part of her skull was laid bare"); *Lee v. Huntsville Livestock Servs., Inc.*, 934 S.W.2d 158, 159 (Tex. App.—Houston [14th Dist.] 1996, no writ) (involving bodily injuries sustained "when [appellant's] car collided with cattle"); *Tarver v. Cty. of Jasper*, 927 S.W.2d 795, 796 (Tex. App.—Beaumont 1996, no writ) (involving alleged bodily injuries sustained when appellant's "right front tire went into the washout causing her to lose control of her vehicle and to strike a tree"); *Sanchez v. King*, 932 S.W.2d 177, 179 (Tex. App.—El Paso 1996, no writ) ("This is an appeal from a personal injury lawsuit arising out of an automobile accident between Appellant and Appellee King while King was driving a vehicle owned by Appellee Exxon."); *Davis v. Davison*, 905 S.W.2d 789, 790 (Tex. App.—Beaumont 1995, no writ) (involving alleged injuries

sustained when appellant was "burned by hot water"); *Monroe v. Grider*, 884 S.W.2d 811, 814, 820 (Tex. App.—Dallas 1994, writ denied) (reversing "jury's denial of damages for pain and suffering and mental anguish []as against the great weight and preponderance of the evidence" for injuries plaintiff suffered when defendant ran into her with a golf cart); *Lopez v. Salazar*, 878 S.W.2d 662, 662–63 (Tex. App.—Corpus Christi 1994, no writ) (appealing from the jury's failure to find damages from injuries sustained when appellants' "van ran off the road"); *Prescott v. Kroger Co.*, 877 S.W.2d 373, 374 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (involving back injuries sustained by delivery man when attempting to unload a "six-wheel cart loaded with products up a ramp to the back entrance of the store"); *Hicks v. Ricardo*, 834 S.W.2d 587, 589 (Tex. App.—Houston [1st Dist.] 1992, no writ) (involving dental malpractice claim in which appellant experienced "swelling, infections, leakage, movement and crumbling of caps" after dentist installed a bridge and extracted a tooth); *Hammett v. Zimmerman*, 804 S.W.2d 663, 664 (Tex. App.—Fort Worth 1991, no writ) (holding in a case involving "personal injuries sustained when [appellants'] car was struck from the rear by a car," that the jury "has no authority to completely ignore the undisputed facts of the case and arbitrarily fix an amount that is unsupported by the evidence," and when there is uncontroverted evidence of an objective injury, a jury finding that plaintiff suffered no past physical impairment and pain is against the great weight and preponderance of the evidence); *Cornelison v. Aggregate Haulers, Inc.*, 777 S.W.2d 542, 548 (Tex. App.—Fort Worth 1989, writ denied) (concluding jury findings that passenger injured in automobile collision suffered zero dollars past physical impairment and pain were so against the great weight and preponderance of the uncontroverted evidence as to be manifestly unjust); *Russell v. Hankerson*, 771 S.W.2d 650, 651, 653 (Tex. App.—Corpus Christi 1989, writ denied) (reversing jury's award of zero damages even though evidence showed objective "personal injuries [appellant] sustained when her car collided with appellee's" because the finding was against the great weight and preponderance of the evidence); *Blizzard v. Nationwide Mut. Fire Ins.*, 756 S.W.2d 801, 803 (Tex. App.—Dallas 1988, no writ) (involving first-party insurance dispute in which the appellant "claim[ed] to have been injured when the car she was driving was struck from behind by a car driven by an uninsured motorist"); *Robinson v. Minick*, 755 S.W.2d 890, 891 (Tex. App.—Houston [1st Dist.] 1988, no writ) (involving "injuries [appellant] suffered in a multiple vehicle collision"); *Porter v. Gen. Tel. Co. of the Sw.*, 736 S.W.2d 204, 204 (Tex. App.—Corpus Christi 1987, no writ) (involving "personal injury suit following an automobile collision"); *Hammond v. Rimmer's Estate*, 643 S.W.2d 222, 223 (Tex. App.—Eastland 1982, writ ref'd n.r.e.) (involving a personal injury case in which plaintiff "was riding his motorcycle" and defendant was driving her automobile when the vehicles collided); *Sansom v. Pizza Hut of E. Tex., Inc.*, 617 S.W.2d 288, 289, 293 (Tex. App.—Tyler 1981, no writ) (reversing and remanding a "suit for personal injuries sustained by appellant . . . resulting from a

fall on the parking lot of a Pizza Hut Restaurant" after jury had found appellant suffered objective personal injuries but awarded zero damages); *Thomas v. Oil & Gas Bldg., Inc.*, 582 S.W.2d 873, 875, 881–82 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.) (holding that zero-damages verdict on, inter alia, past physical pain and mental anguish was against the great weight and preponderance of the evidence when the undisputed evidence showed that appellant had broken her ankle when she slipped and fell in a hallway); *Horn v. State Farm Ins.*, 567 S.W.2d 266, 267 (Tex. App.—Tyler 1978, no writ) (involving "damages for personal injuries allegedly sustained by [plaintiff] as the result of an automobile collision"); *Cavitt v. Jetton's Greenway Plaza Cafeteria*, 563 S.W.2d 319, 321 (Tex. App.—Houston [1st Dist.] 1978, no writ) (reversing and remanding personal injury action in which jury "found the defendant guilty of serving unwholesome food" when plaintiff found a roach in her dessert causing her injury but failed to award money damages in any amount); *Bazzano v. Ware*, 530 S.W.2d 650, 650 (Tex. App.—Beaumont 1975, writ ref'd n.r.e.) ("This is an action for damages for personal injuries received in a rear-end collision."); *Nye v. W & L Co.*, 519 S.W.2d 142, 143 (Tex. App.—Amarillo 1975, writ ref'd n.r.e.) (reversing and remanding case in which airplane passenger plaintiff sought monetary damages for injuries suffered as a result of an airplane crash because "jury's negative answer to the personal injury damage issue, upon which the court entered a take-nothing judgment, is contrary to the admission that some damage was suffered"); *Taylor v. Head*, 414 S.W.2d 542, 544 (Tex. App.—Texarkana 1967, writ ref'd n.r.e.) (reversing and remanding zero-damages award for pain and suffering in rear-end automobile collision case because "a jury must award some damages for pain and suffering"); *Bolen v. Timmons*, 407 S.W.2d 947, 948 (Tex. App.—Amarillo 1966, no writ) (involving bodily injuries sustained when appellant "was sitting on his motorcycle with his foot on the brake while stopped at a red light . . . when he was rear-ended by appellee"); *Edmondson v. Keller*, 401 S.W.2d 718, 719 (Tex. App.—Austin 1966, no writ) (reviewing "a personal injury action brought for damages plaintiff sustained in an automobile collision"); *see also Blevins v. State Farm Mut. Auto. Ins.*, No. 02-17-00276-CV, 2018 WL 5993445, at *1, *13 (Tex. App.—Fort Worth Nov. 15, 2018, no pet. h.) (mem. op.) (refusing to conclude that "jury went against the great weight and preponderance of the evidence in such a way as to show a manifest injustice" even in light of "objective yet relatively insignificant injuries" sustained by appellant in a car wreck); *Lara v. Weeks Marine, Inc.*, No. 04-06-00237-CV, 2007 WL 1540269, at *1, *4 (Tex. App.—San Antonio May 30, 2007, no pet.) (mem. op.) (reversing and remanding a case in which a deckhand on a ship "fell through the hatch" and injured himself and jury received objective, undisputed evidence that deckhand sustained at the very least a shoulder fracture but awarded zero damages because the zero-damages award was against the great weight and preponderance of the evidence); *Byrd v. Westerhof*, No. 03-00-00180-CV, 2001 WL 101517, at *1 (Tex. App.—Austin Feb. 8, 2001, no pet.) (not

Lennon II that is not a personal injury case is also distinguishable because it is a breach-of-contract case in which there was "some objective evidence of the damages." *See Heritage Operating, L.P. v. Rhine Bros.*, No. 02-10-00474-CV, 2012 WL 2344864, at \*8 (Tex. App.—Fort Worth June 21, 2012, no pet.) (mem. op. on reh'g). Thus, Lennon II has directed us to no authority to support the proposition that a jury must award some damages after an affirmative finding of conversion when there is no probative evidence of the property's fair market value.

### D. Is a $0.00 finding against the great weight and preponderance of the evidence?

Though most of the authority cited by Lennon II is inapposite, its brief does raise the appropriate question to challenge the jury's zero-damages answer—does the record contain evidence of the fair market value of select fill that renders the zero-damages answer against the great weight and preponderance of the evidence? It does not.

#### 1. Damages for converted dirt

There is no doubt that dirt may be converted:

> Earth . . . in its original bed is a part of realty and as such cannot be a subject of conversion; but where it has been wrongfully severed and removed, it becomes personalty for the conversion of which an action will lie. These materials continue to be the property of the landowner after they are removed from their bed or place in the soil.

---

designated for publication) (involving suit "for injuries sustained following an automobile collision").

*Dahlstrom Corp. v. Martin*, 582 S.W.2d 159, 161 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (citing *Cage Bros. v. Whiteman*, 163 S.W.2d 638 (Tex. [Comm'n Op.] 1942)).

But as with any claim grounded in conversion, "[t]he measure of damages . . . is the value of the property converted at the time of the conversion, with legal interest." *Bishop*, 631 S.W.2d at 584. "It is essential that the market value of the property at the place and on the day of conversion be established to recover." *Id.* As the jury was instructed below, "[m]arket value is the price property would bring if it were offered for a sale by a willing but not obligated seller and purchased by a willing but not obligated buyer." *Taiwan Shrimp Farm Vill. Ass'n v. U.S.A. Shrimp Farm Dev., Inc.*, 915 S.W.2d 61, 71 (Tex. App.—Corpus Christi 1996, writ denied).

### 2. Analysis

Although at trial there was substantial testimony about and discussion of the price paid by AGL to Gideo as well as the cost to return the Property to its previous condition, both the record and the references in Lennon II's brief lack a key element—evidence demonstrating the fair market value of the select fill itself at the time and place of the conversion.[18]

---

[18]We (again) note the challenge Mr. Lennon's unavailability posed to Lennon II's case. With regard to damages, when the converted property has no fair market value that is readily ascertainable, the damages are the actual value of the property to the owner at the time of its loss. *Crisp v. Sec. Nat'l Ins.*, 369 S.W.2d 326, 329 (Tex. 1963). Without deciding whether the select fill in this case falls into that category, assuming *arguendo* that it did, a property owner such as Mr. Lennon could

Lennon II's starting point on its sufficiency challenge to the jury's $0.00 fair-market-value finding is that the undisputed evidence of the purchase price shows that the dirt had some value: "[I]t is undisputed that [AGL] paid approximately $700,000 for the property. The evidence showed at a minimum that the fair market value was at least $701,334, which is what AGL paid and Gideo received for the soil that was excavated and removed." Indeed, Lennon II's trial counsel argued this theory of conversion damages to the jury:

> [LENNON II'S COUNSEL]: The next question you're asked is, what the fair market value of that property is, and the only evidence that we have in the case is the testimony of David Thiel that it was 175,000 cubic yards of dirt and that they paid Mr. Gideo $701,000 for that dirt, okay?
>
> Now, if you believe that Mr. Lennon authorized a portion of the dirt that was removed to be removed, then you should reduce that number. But if you don't believe that he authorized any of this dirt to be permanently removed and excavated, then you should award the entire amount.
>
> It has -- that is the fair market value of the dirt because that's what AGL paid for it.

This premise is flawed for two reasons.

First, the $700,000 purchase price included the cost of more than just the select fill. Svehla testified that the amount of $700,000 at $4.00 per cubic yard of select fill paid by AGL to Gideo was not just the amount of the granules of soil, but also included Gideo's costs for excavating the dirt and loading it. Thus, the amount paid

testify as to the value of his property even if he was not an expert. *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852–53 (Tex. 2011).

53

by AGL to Gideo is not a proper measure of fair market value of the dirt because it included costs for other services without providing a way for the jury to segregate the value of the soil from the value of the services. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 712 (Tex. 2016) ("If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable." (quoting *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986))).

Second, the purchase price of the converted property is not competent evidence of the fair market value of the property. *See Bishop*, 631 S.W.2d at 584 ("Compensatory or actual damages are not measured in a conversion case by the price at which the goods in question were sold by the defendant but by market value at place and time of conversion."). Thus, even if the $4.00 per cubic yard was only for the select fill and not Gideo's services, the purchase price between AGL and Gideo is still not the proper measure of determining the fair market value of the select fill. *See Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 889 (Tex. App.—Dallas 2009, no pet.) (reciting that when calculating conversion damages, "[p]urchase price is ordinarily not even admissible to show market value at a particular later time").

Our review of the trial record reveals no testimony or evidence of the fair market value of the select fill dirt. On direct examination, Svehla testified that $4.00 represented the fair market value of the dirt. He stated that it was "[o]n the high end of the market value." However, immediately preceding this question, Svehla testified

54

that the $4.00 price included services from Gideo for excavating and loading in addition to the granules of dirt. Therefore, this general statement from Svehla does not supply a range of values for the jury to calculate the select fill's fair market value at the time and place of the conversion. *See Sw. Energy Prod. Co.*, 491 S.W.3d at 712.

Casey Padgett, an environmental contractor in the business of removing contaminated soil, testified about, inter alia, the costs of filling in the holes on the Property. He stated that a ton of common fill sells for $13.25 per ton. However, Padgett acknowledged on cross-examination that common fill is different than select fill. And, when questioned on redirect, Padgett could not definitively provide the market value of select fill:

> Q. Mr. Padgett, you were asked about the difference between common fill and select fill.
>
> What is the cost -- what is the unit cost that Sunbelt charges for select fill per cubic yard?
>
> A. For --
>
> Q. I'm talking about right now.
>
> A. It varies.
>
> Q. All right.
>
> A. It depends on where you're at.
>
> Q. Well, for a project located at [the Property], what would your -- your job is an estimator, correct?
>
> A. Yes, sir.

Q. Okay. What would you estimate per cubic yard for select fill?

A. I -- I couldn't estimate that. That comes --

Q. Well --

A. Oh, I'm sorry.

Q. Go ahead.

A. It comes from our trucking department.

Thus, Mr. Padgett's testimony does not undermine the jury's $0.00 fair-market-value finding.

Similar testimony about common fill came from Ethan Cox, the Director of the City of Denton landfill. He testified that the landfill sells common fill soil for $375 per ton. But it was undisputed that the converted property was select fill, not common fill. Thus, Cox's testimony is not competent evidence of the fair market value of the select fill.

Indeed, not only does the record not establish a fair market value for select fill, the record contains other evidence in support of the jury's zero fair-market-value finding. That support comes from evidence that the select fill actually has no market value. Testimony from Swesey demonstrated that the value of the select fill could be negative in the sense that the owner would actually need to pay to have it removed and that by Gideo's removing and selling the select fill to AGL, Lennon II was "saving . . . a fortune." And Gideo testified that the cost of removing the dirt would be $1 million. Thus, even if the jury could have taken the $700,000 purchase price as

56

evidence of the fair market value of the select fill, given the testimony that the removal cost would have far exceeded that amount, it would have been within the range of values presented at trial to calculate that the fair market value of the select fill was $0.00. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) ("In determining damages, the jury has discretion to award damages within the range of evidence presented at trial.").

Therefore, we hold that the jury's fair-market-value finding of "$0.00" is not against the great weight and preponderance of the evidence, and we overrule Lennon II's first issue.

## V. BONA-FIDE-PURCHASER-FOR-VALUE JURY QUESTION

In its second issue, Lennon II contends that the trial court erred in submitting a jury question on whether AGL was a bona fide purchaser for value. Though we are dubious of the propriety of submitting that question, our holding sustaining the jury's zero-damages finding renders the issue moot.

### A. Standard of review

"We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The trial court has considerable discretion to determine proper jury instructions, and "[a]n instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009). However, "[w]hen, as

here, the content of a trial court's definition is challenged as legally incorrect, our standard of review is de novo." *Transcon. Ins. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010) (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002)).

"A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict . . . ." *Columbia Rio Grande Healthcare*, 284 S.W.3d at 856 (citing Tex. R. App. P. 61.1); *see* Tex. R. App. P. 44.1(a)(1). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare*, 284 S.W.3d at 856 (citing *Bel–Ton Elec. Serv., Inc. v. Pickle*, 915 S.W.2d 480, 481 (Tex. 1996) (per curiam), and *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

## B. Applicable law

Numerous courts, including ours, have held that neither complete innocence nor perfect good faith are defenses to an action for conversion. *See, e.g.*, *Henson v. Reddin*, 358 S.W.3d 428, 435 (Tex. App.—Fort Worth 2012, no pet.) ("[I]nnocence is no defense to conversion."); *Am. Petrofina, Inc. v. PPG Indus., Inc.*, 679 S.W.2d 740, 759 (Tex. App.—Fort Worth 1984, writ dism'd by agr.) ("Neither complete innocence nor perfect good faith are defenses to an action for conversion."); *Geders v. Aircraft Engine & Accessory Co.*, 599 S.W.2d 646, 651 (Tex. App.—Dallas 1980, no writ) ("[A] good faith but unauthorized retention of property can be a conversion."); *McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex. App.—Corpus Christi 1979, no writ) ("In a conversion suit, it is no defense that the defendant acted in good faith."); *Loomis v. Sharp*, 519

58

S.W.2d 955, 958 (Tex. App.—Texarkana 1975, writ dism'd) ("The fact that appellants took a bill of sale from Osborn covering the pickup, and even paid him for it, avails them nothing. One who buys personal property must at his peril ascertain the true ownership, and if he buys from one who has no authority to sell, his possession of the chattel in denial of the owner's right is a conversion."); *White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658, 662 (Tex. App.—Houston [14th Dist.] 1972, no writ) (same).

Yet against the force of this precedent, AGL cites a case in which the appellate court analyzed whether the defendant was a bona fide purchaser for value, as defined by the Uniform Commercial Code (UCC), which the defendant had pleaded as an affirmative defense to the plaintiff's conversion claim. *Carter v. Cookie Coleman Cattle Co.*, 271 S.W.3d 856, 858 (Tex. App.—Amarillo 2008, no pet.) (citing Tex. Bus. & Com. Code Ann. § 2.403). While the *Carter* court ultimately concluded that the defendant was not a bona fide purchaser for value, *id.* at 860, *Carter* has since been cited in three federal district court cases for the proposition that a bona fide or good faith purchaser status is an affirmative defense to a conversion claim. *See Dynamic Prod., Inc. v. CIMA Energy Ltd.*, No. 4:17-CV-1032, 2018 WL 1801193, at *6 (S.D. Tex. Feb. 21, 2018) (citing *Carter* to support that "[a] bona fide—or good faith—purchaser for value has an affirmative defense against a conversion claim"), *report and recommendation adopted*, No. 4:17-CV-1032, 2018 WL 1870554 (S.D. Tex. Apr. 19, 2018); *Pemex Exploracion y Produccion v. BASF Corp.*, Nos. H-10-1997, H-11-2019, 2013

WL 5514944, at *5 (S.D. Tex. Oct. 1, 2013) (same); *Hyde & Hyde, Inc. v. Mount Franklin Food, LLC*, No. EP-11-CA-08-FM, 2012 WL 7062626, at *4 (W.D. Tex. Apr. 30, 2012) (same), *aff'd sub nom. Hyde & Hyde, Inc. v. Mount Franklin Foods, L.L.C.*, 523 F. App'x 301 (5th Cir. 2013).

We agree with Lennon II that *Carter* and its federal progeny are outliers. Moreover, we find the *Carter* case factually distinguishable because in that case the bona-fide-purchaser-for-value defense was expressly raised under the UCC, whereas here, AGL's defense was raised under the common law. *Cf.* 65 Tex. Jur. 3d *Sales* § 110 (2019) ("Unlike the common law, good faith purchaser status under the Uniform Commercial Code is not concerned with actual or constructive knowledge by the purchaser of an existing third party claim to the subject goods.").

Accordingly, we reaffirm our previous holdings that neither complete innocence nor perfect good faith are defenses to conversion. Thus, the submission of the jury question on whether AGL was a bona fide purchaser for value as an affirmative defense to Lennon II's conversion claim was in error.

**C. Analysis**

But "[s]ubmission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). "A jury question is considered immaterial when . . . its answer cannot alter the effect of the verdict." *Id.*

Having already analyzed and affirmed that the jury's finding that the fair market value of the converted property was $0.00 was not against the great weight and preponderance of the evidence, we conclude that the submission of the erroneous bona-fide-purchaser-for-value question was harmless error because its answer cannot have altered the effect of the verdict. That is, even if the jury had answered "No," it would not alter the fact that the jury concluded that the value of the converted property was "$0.00," so Lennon II would still take nothing on its conversion claim. *See id.*

Accordingly, we overrule Lennon II's second issue.

## VI. FINDING OF NO TRESPASS

In its third issue, Lennon II contends that the jury's finding of no trespass is against the great weight and preponderance of the evidence and is manifestly unjust. Although Lennon II mentions the removal of soil in support of its trespass claim, its appellate briefing focuses primarily on AGL's placing of steel-reinforced concrete and asphalt millings and chunks—expressly authorized by Gideo—as constituting a trespass because it exceeded the scope of any authorization from Lennon II. Gideo and AGL respond that it was Lennon II's burden to establish a lack of consent or authorization and that the jury's implied finding that Lennon II did not establish lack of consent is not against the great weight and preponderance of the evidence or manifestly unjust. The record supports the position of Gideo and AGL.

61

## A. Applicable law

"Trespass to real property occurs when a person enters another's land without consent." *Wilen v. Falkenstein*, 191 S.W.3d 791, 797 (Tex. App.—Fort Worth 2006, pet. denied). With respect to the consent element, the Supreme Court of Texas has clarified and held that "to maintain an action for trespass, it is the plaintiff's burden to prove that the entry was wrongful, and the plaintiff must do so by establishing that entry was unauthorized or without its consent." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 425 (Tex. 2015). In so holding, the Supreme Court of Texas suggested that this burden on the plaintiff would usually be easy to satisfy because the plaintiff/owner would generally be able to provide evidence (i.e., the owner's testimony) of the owner's lack of consent:

> [W]e do not believe it will be difficult for a landowner or possessory interest holder to prove lack of consent or authorization. After all, the landowner or possessor who is bringing suit is in the best position to provide evidence on whether an alleged trespasser's presence was unauthorized because only someone acting with the authority of the landowner or one with rightful possession can authorize, or consent to, the entry.

*Id.* at 424 (internal quotation marks omitted).[19]

## B. Analysis

We begin our review by determining if any evidence supports the jury's finding of no trespass. *Dow Chem. Co.*, 46 S.W.3d at 241. As detailed above, the jury

---

[19]The charge defined "Trespass" to mean "an entry on property of another without having the consent or authorization of the owner."

considered evidence of the Development Plan and Gideo's testimony that it authorized him to sell the select fill to AGL and prepare the Property for development; testimony from Gideo, Svehla, and Swesey that at the November 3, 2014 meeting, Mr. Lennon was in agreement with the project; Gideo's testimony that Mr. Lennon came to the Property while the select fill was being excavated for AGL and that he did not voice any objection; and Gideo's testimony that he was only 25% done with the AGL project and that the asphalt and concrete were recyclable and could be sold or disposed of easily. The jury also heard from Gideo more generally that Mr. Lennon had allowed him to place and store various items—including his trailer, cows, and dirt—on the Property since 2008. This evidence supports that Lennon II did not establish a lack of consent to Gideo and AGL.

Against this evidence, Lennon II can point to nothing from Mr. Lennon to demonstrate a lack of consent. Instead, Lennon II focuses on AGL's internal e-mails and messages expressing concern over the Development Plan; AGL's request that Gideo have Mr. Lennon sign AGL's Proposed Agreement; testimony from Svehla and Swesey that they never discussed removal of the select fill or placing concrete and asphalt at the November 3, 2014 meeting; and testimony from Swesey that he did not believe there was authorization to dump asphalt on the Property without a permit. But this circumstantial evidence was contradicted by AGL with the above-referenced direct testimony from Svehla and Swesey. Svehla testified that at no time during the November 3, 2014 meeting did he doubt that Mr. Lennon understood what was going

on or why AGL was there. Swesey testified that his perception from the November 3, 2014 meeting was that Mr. Lennon had authorized Gideo to act:

> Q. And is there anything that happened during your drive-around that gave you the impression that Mr. Gideo did not have Mr. Lennon's authority to be out there directing traffic and doing this work?
>
> A. No.
>
> Q. In fact, it was your impression that Mr. Lennon knew what was going on and had given Mr. Gideo that authority; isn't that true?
>
> A. Yes.

The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Moreover, it is within the province of the jury to weigh opinion evidence and the judgment of experts. *Banks v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 233 S.W.3d 64, 67–68 (Tex. App.—Dallas 2007, pet. denied). It is the jury's role to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. *Id.*

Thus, the jury was free to believe, and could have believed, that AGL's insistence on AGL's Proposed Agreement was out of an abundance of caution rather than legal necessity. Indeed, the e-mail in which the lawyer at AGL expressed that he was "worried" that Mr. Lennon did not sign AGL's Proposed Agreement reveals the two reasons for his concern: he wanted to establish (1) that Mr. Lennon owned the Property and (2) that AGL was not obliged to return the select fill. Put differently,

AGL was not "worried" that Gideo did not have authority from Mr. Lennon or that it was not authorized to remove the select fill and place concrete and asphalt millings and rubble on the Property.

Moreover, even if Mr. Lennon's refusal to sign AGL's Proposed Agreement could be some evidence of a lack of consent, the jury also heard testimony from Glen that Mr. Lennon did not trust lawyers, as well as testimony from Gideo that Mr. Lennon had not wanted to deal with J.D. Abrams directly. At the November 3, 2014 meeting, Gideo and Mr. Lennon sat in the front of Gideo's truck and AGL's representatives sat in the back. Swesey testified that at the November 3, 2014 meeting, it seemed that Mr. Lennon knew what was going on and had given Gideo authority. This evidence coupled with the Development Plan—which nowhere precluded Gideo from placing asphalt and concrete on the Property as part of his "use of the [P]roperty"—supports the reasonable inference that Mr. Lennon refused to sign AGL's Proposed Agreement, not because he did not consent to it, but because he had an agreement with Gideo authorizing Gideo to contract with AGL, because he did not trust documents drawn up by unknown lawyers, and because he wanted Gideo alone to deal directly with AGL as he had done with J.D. Abrams.

We also note that while Carter testified that he had no reason to believe that Gideo had authority to sell over 100,000 cubic yards of select fill from the Property, Carter elsewhere testified that he was unaware of the relationship between Mr. Lennon and Gideo and any communications they had from 2008 through 2015.

Therefore, Carter's testimony speculating that Mr. Lennon would not have authorized the sale of the select fill will not support Lennon II's factual sufficiency challenge. *See Ethicon Endo-Surgery, Inc. v. Meyer*, 249 S.W.3d 513, 519 (Tex. App.—Fort Worth 2007, no pet.) (op. on reh'g) ("Speculation is not evidence."). Had Mr. Lennon been available, presumably he could have testified to the issue of consent or lack thereof. But again, because Mr. Lennon was not available at trial, neither was any testimony elicited from Lennon II on the issue of consent.

Lennon II's argument may be that the removal of extra fill dirt and the dumping of material exceeded the scope of consent given by the Development Plan. If so, we are unwilling to hold that the jury's failure to find a trespass is against the great weight and preponderance of the evidence. Again, the evidence established the broad authority of the Development Plan and the prior use of the Property that Mr. Lennon had given Gideo. And once again, the jury heard nothing from Mr. Lennon as to whether he placed any restrictions on this apparently broad authority. With the evidentiary mix of this record, we cannot fault how the jury performed its assigned duty of balancing the evidence.

Therefore, we hold that the jury's finding—that Lennon II did not establish a lack of consent with respect to both Gideo and AGL regarding select fill removal and the placing of asphalt and concrete—was not against the great weight and preponderance of the evidence and manifestly unjust. *See FPL Farming*, 457 S.W.3d at 418–25 (holding because FPL Farming did not establish that the entry was

unauthorized or without its consent, even if a trespass claim existed, it necessarily failed).  Accordingly, we overrule Lennon II's third issue.

## VII. JURY'S FINDING OF AN AGREEMENT

In its fourth issue, Lennon II contends that the trial court erred by submitting Jury Question 11 on Gideo's breach-of-contract counterclaim because the alleged agreement concerned the sale of goods, and as such, is governed by the UCC.  *See* Tex. Bus. & Com. Code Ann. § 2.201.  And because the transaction concerned the sale of goods rather than services, it is within the UCC's statute of frauds and required a specified quantity to be enforceable.  *See id.*  According to Lennon II, the Development Plan did not satisfy the statute of frauds, and a separate jury question should have been submitted about the Development Plan's primary purpose.

In the context of the jury's answers to the charge, with respect, we are unable to discern why Lennon II's issue is more than much ado about nothing.  The question at issue submitted a breach-of-contract cause of action brought by Gideo.  In essence, the argument is that the trial court allowed the jury to find a breach based on a legally unenforceable contract, i.e., an oral contract that the law required to be in writing because a sale of goods was the essence of the transaction.  The jury, however, found no breach, and the trial court entered a take-nothing judgment on Gideo's contract claim.  Without a recovery on the allegedly unenforceable contract, we cannot understand how Lennon II's issue on appeal is more than academic.  Even if the

67

jurors were misled that the contract described in the charge was valid, no harm accrued as a result of that error because the jury found no breach.

"It is the complaining party's burden to show harm on appeal." *Guniganti v. C & S Components Co.*, 467 S.W.3d 661, 666 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Because the jury found that Lennon II had not breached an agreement and that Gideo had suffered no damages, Lennon II has failed to show how it was harmed by the submission of Question 11. *See* Tex. R. App. P. 44.1.

In its reply brief, Lennon II's argument transmogrifies into a claim both that the submission of the contract question (without the requested accompanying instruction) was error and that the trial court erred in admitting the Development Plan into evidence. It is unclear whether Lennon II is attempting to raise an appellate issue that the trial court erred in admitting the Development Plan into evidence, but if so, the argument comes too late. *See* Tex. R. App. 38.3; *Fox v. City of El Paso*, 292 S.W.3d 247, 249 (Tex. App.—El Paso 2009, pet. denied) (holding a reply brief may not be utilized as a vehicle to present a new issue to the court). Moreover, it was preadmitted at Lennon II's request. *See Haney v. Purcell Co.*, 796 S.W.2d 782, 788 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ("A party cannot complain of the admission of improper evidence, if he first introduced the same or similar evidence.").

Further, if it is Lennon II's theory that the failure of the Development Plan to conform to the statute of frauds demonstrates that Gideo had no consent to enter the Property and was thus a trespasser, we disagree.

Coaxing arguments from Lennon II's brief, we view its argument as perhaps

being that the unenforceability of the Development Plan under the statute of frauds

would deprive Gideo of the argument that the Development Plan constituted consent

and that his entry onto the Property relying on the Development Plan therefore

constituted trespass. If that is the argument, it is invalid. Williston dismisses this

argument:

> Even though the local [s]tatute of [f]rauds declares an oral agreement void, evidence of the agreement should be admissible in order to negate the implication of fact that might otherwise arise from the circumstances. The oral agreement should also be provable to prevent the imposition of any quasi-contractual or tort liability at variance with the express terms of the agreement as fully as if that agreement had been in writing. In these and similar cases, the oral contract is not being offered by the defendant in order to be enforced but rather to prevent the enforcement of another alleged agreement. In addition, since most of the [s]tatutes of frauds provide either that no action may be brought on an oral contract or that an oral contract with the [s]tatute's terms is void or unenforceable or that an oral contract within the [s]tatute's provisions may not be enforced by way of action or defense, that the defendant is not raising the oral agreement for purposes of enforcing it should be dispositive of its admissibility. Only if the words of the local [s]tatute as construed by the relevant courts purported to preclude the use of the oral agreement for any purpose—or included comparable language—should evidence of the alleged oral agreement be inadmissible.

10 Richard A. Lord, *Williston on Contracts* § 27:7 (4th ed. Westlaw database updated

July 2019) (citations omitted); *see also* Restatement (Second) of Contracts § 142 (Am.

Law Inst. 1981) ("Where because of the existence of a contract conduct would not be

tortious, unenforceability of the contract under the Statute of Frauds does not make the conduct tortious if it occurs without notice of repudiation of the contract.").[20]

Therefore, any error in the submission of Question 11 is not reversible. We overrule Lennon II's fourth issue.

## VIII. CONCLUSION

Having overruled Lennon II's five issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 29, 2019

---

[20]Also, the Development Plan may well be a license, that is "a personal, revocable, and unassignable privilege, conferred either by writing *or parol*, to do one or more acts on land without possessing any interest" in the land. *Joseph v. Sheriffs' Ass'n*, 430 S.W.2d 700, 703 (Tex. App.—Austin 1968, no writ) (emphasis added). Certainly, "[a] licensee who goes beyond the rights and privileges granted by the license becomes a trespasser." *Burton Constr. & Shipbuilding Co. v. Broussard*, 273 S.W.2d 598, 603 (Tex. 1954). The charge that Lennon II proposed did not submit such a theory.